THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ABNER SMITH *et al.* Plaintiffs in Error.

*Opinion filed February 19, 1909—Rehearing denied April 8, 1909.*

1. CONSPIRACY—*indictment for conspiracy to do an illegal act need not set out means to be used.* An indictment charging a conspiracy to do an unlawful act, such as to obtain money or goods by false pretenses, need not set forth the means whereby the conspiracy is to be carried into effect, as it is only necessary to set forth such means when the conspiracy is to do a lawful act but unlawful means are to be used to carry it into effect.

2. SAME—*when indictment need not allege the conspiracy was formed against any particular person.* An indictment charging in some counts that the defendant bankers conspired to cheat and defraud the public generally, and in others that the victims of the conspiracy were the stockholders, depositors, creditors and customers of the bank, need not allege that the conspiracy was formed against any particular person, as proof of such fact is not necessary in order to establish an offense.

3. SAME—*indictment need not name all conspirators known to grand jury.* The persons engaged in a conspiracy are not so far a part of the offense as to be descriptive of the offense itself, and the fact that one of the conspirators known to the grand jury is designated in the indictment as a person unknown to them is not such a misdescription of the parties as is fatal to a conviction.

4. SAME—*when refusal to require a bill of particulars is harmless.* Where most of the counts of an indictment for conspiracy are sufficiently specific to apprise the defendants fully of the offense charged and the means whereby the conspiracy was to be carried into effect, and no evidence is offered which is not properly admissible under such counts, the refusal of the court to require the People to file a bill of particulars is not harmful.

5. SAME—*when persons are guilty of a conspiracy to obtain money by false pretenses.* Persons who form a scheme to organize a bank under the State law without having the capital stock fully paid for in cash, and who obtain their charter by deception, elect themselves officers and directors and make and publish false statements that the bank is solvent and has a large capital fully paid and large assets and surplus, thereby obtaining the money of the public and of the stockholders, depositors, creditors and customers of the bank, are guilty of conspiring to obtain goods and money by false pretenses.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. M. W. PINCKNEY, Judge, presiding.

On April 27, 1906, the plaintiffs in error, Abner Smith and Gustave F. Sorrow, together with Jerome V. Pierce and Frank E. Creelman, were jointly indicted by the grand jury of Cook county for conspiracy to obtain money and other property by false pretenses. After a motion to quash the indictment had been overruled a plea of not guilty was entered, and upon the trial Creelman was found not guilty and Smith, Sorrow and Pierce were convicted. Smith and Sorrow were each sentenced to the penitentiary and to pay a fine of $1000, and Pierce was fined $500, which he has paid. Smith and Sorrow sued out a writ of error from the Appellate Court for the First District, where the judgment of conviction was affirmed, and they have sued out a writ of error from this court to review the judgment of the Appellate Court.

The indictment contains nine counts, some of which charge a statutory and others a common law conspiracy. The first count is a statutory count, and, omitting the formal part, is as follows: "That Abner Smith, Jerome V. Pierce and Gustave F. Sorrow made application to the Auditor of Public Accounts for permission to organize a bank under the provision of an act of the General Assembly of the State of Illinois approved June 16, 1887; that on October 31, 1905, said Auditor granted permission to organize a bank to be called 'The Bank of America,' with a capital stock of $250,000; that on the first day of December, 1905, said Smith, Sorrow and one Frank E. Creelman and Jerome V. Pierce were engaged in promoting and organizing the bank; that said Abner Smith, Jerome V. Pierce and Gustave F. Sorrow and said Frank E. Creelman applied to and solicited divers persons to become stockholders and to

subscribe for stock at the rate of $200 per share, and represented to said persons that $100 of said subscription would go to make up a surplus fund; that on the 29th day of November, 1905, there were a large number of persons who had subscribed for the stock; that on the date last aforesaid said Abner Smith, Jerome V. Pierce, Gustave F. Sorrow, Frank E. Creelman, Lewis C. Muller, Daniel D. Healy, Ferdinand W. Peck, Frank Billings, L. E. Becker, William J. Murphy, John E. Kavanagh, Frank H. Savage, Robert H. Howe, Sidney F. Badger and one Alexander Harris were elected directors of said bank; that on the same day Abner Smith was duly elected president, Gustave F. Sorrow was elected vice-president and Jerome V. Pierce was elected cashier of said bank; that on December 2, 1905, the Auditor of Public Accounts of the State of Illinois issued a certificate charter privilege, franchise and right to said Bank of America to conduct and carry on in the city of Chicago the business designated in section 1 of an act of the General Assembly of the State of Illinois aforesaid; that on the 4th day of December, 1905, said Abner Smith, Jerome V. Pierce and Gustave F. Sorrow and Frank E. Creelman opened and caused to be opened said Bank of America and carried on a general banking business in Chicago; that said Abner Smith was then and there acting as president and director of said bank, the said Jerome V. Pierce was then and there acting as cashier and director; that the said Gustave F. Sorrow was then and there acting as vice-president and director and that said Frank E. Creelman was then and there acting as director of the said Bank of America; that there were a large number of stockholders, to-wit, two hundred, and a large number of depositors, to-wit, fifteen hundred depositors; that there were a large number of creditors, to-wit, two hundred creditors, and a large number of customers, to-wit, two hundred customers, of said Bank of America; that a large number of said stockholders, depositors, creditors and customers of said Bank of

America were then and there ignorant and uninformed of the true condition of the affairs of said bank; that said Abner Smith, Jerome V. Pierce, Gustave F. Sorrow and Frank E. Creelman, devising and fraudulently intending to acquire and get into their hands and possession the moneys, goods and properties of the public by false, fraudulent and dishonest means, on the 14th day of February, 1906, wrongfully, wickedly, fraudulently, feloniously and unlawfully conspired, combined, confederated and agreed together and with each other, and with divers other persons whose names are to the said grand jurors unknown, to get and obtain, knowingly and designedly and by false pretenses, the moneys, goods and properties of the public, with the intention on the part of said Abner Smith, said Jerome V. Pierce, said Gustave F. Sorrow and said Frank E. Creelman to cheat and defraud and injure the public, contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

The second count is substantially like the first, except it concludes, "contrary to the law," etc. The third count sets out the inducement the same as it is set forth in the first and second counts, and then charges "that the said Abner Smith, while he was then and there president and director, said Jerome V. Pierce, while he was then and there cashier and director, Gustave F. Sorrow, while he was then and there vice-president and director, and Frank E. Creelman, while he was then and there a director of said Bank of America, well knowing the premises in this count before mentioned and well knowing the bank and its affairs to be in a bad and dangerous condition and approaching insolvency, and that said bank was then insolvent and that the stock and shares were unsafe and might be ruinous to the holders thereof, and well knowing that depositors in said bank might lose their deposits, and fraudulently devising and intending to acquire and get into their hands and possession the moneys, goods and property of the stockholders, the de-

positors, creditors and customers of said Bank of America, and such other persons who might believe certain false representations and pretenses hereinafter named to be true and become stockholders, depositors, creditors and customers of the said Bank of America, by fraudulent and dishonest means, on the 14th day of February, 1906, did wrongfully, wickedly, fraudulently and deceitfully conspire, combine, confederate and agree together and with each other, and with divers other persons whose names were unknown, etc., to get and obtain, knowingly and designedly and by false pretenses, the moneys, goods, chattels and property of the stockholders, creditors and customers of said bank, and of such other persons who might believe certain false representations and pretenses hereinafter named to be true and become stockholders, depositors and creditors of said bank, by means of divers false pretenses and subtle means and devices in substance as follows, that is to say, to represent and pretend to said stockholders, creditors and customers of said bank, and to such other persons who might believe said false representations and pretenses as hereinafter named to be true and become stockholders, depositors, creditors and customers of said Bank of America, and to such other persons who might believe the said false representations and pretenses as hereinafter named to be true and become stockholders, depositors, creditors and customers of said Bank of America, that said Bank of America was carrying on a profitable banking business, that its pecuniary affairs were in a sound and prosperous condition, that the capital stock in the sum of $250,000 of said Bank of America was then and there all fully paid in in cash, and that the said Bank of America then and there had a surplus of $250,000 all fully paid, and that the said Bank of America was then and there solvent, and that the said Bank of America then and there had total resources to the value and amount of $803,-090.60, and that the said Bank of America then and there had a capital stock in the sum of $250,000, and that the said

Bank of America had a capital and surplus in the sum and to the amount of $500,000, whereas, in truth and in fact, as they, the said Abner Smith, said Jerome V. Pierce, said Gustave F. Sorrow and said Frank E. Creelman then and there well knew, the said Bank of America then was not carrying on a profitable banking business, that its pecuniary affairs were not then in a sound and prosperous condition, that the capital stock in the sum of $250,000 of the said Bank of America was not then all fully paid in cash, and that the said Bank of America did not then have a surplus of $250,000 all fully paid, and that said Bank of America was not then solvent, and that said Bank of America did not then have total resources to the value and amount of $803,090.60, and that the said Bank of America did not then have a capital stock in the sum of $250,000 and surplus in the sum of $250,000, and that the said Bank of America did not then have capital and surplus in the sum and to the amount of $500,000, to induce such stockholders, depositors, creditors and customers of said Bank of America, and such other persons who might believe said false representations and pretenses to be true and become stockholders, depositors, creditors and customers of said Bank of America as were ignorant of the true state of affairs of the said Bank of America, to purchase and hold the stock thereof, to deposit money therein, to become creditors thereof and to deal there, with intent then and there fraudulently and maliciously to cheat and defraud the said stockholders, depositors, creditors and customers of said Bank of America, and the said other persons who might believe the said false representations and pretenses to be true and become stockholders, depositors, creditors and customers of the said Bank of America, of their money, goods and property, contrary to the law and against the peace and dignity of the same people of the State of Illinois."

The fifth count is the same as the third, except it charges that the object of the conspiracy was to obtain by false pre-

tenses the money and property of the public generally, instead of that of the stockholders, depositors, creditors and customers of the bank, as was charged in the third count. The sixth count is the same as the third, except that the false pretenses are charged to have been contained in a statement in writing purporting to be a statement of the true condition of the affairs of the bank, which was printed and circulated by defendants. This statement is as follows:

"BANK OF AMERICA,
    *N. E. Corner Clark and Randolph Streets, Chicago.*
                          Opened for business December 4, 1905.
    "Statement of the condition of the Bank of America at the opening of business, January 30, 1906.

RESOURCES.

| | | |
|---|--:|--:|
| Loans and discounts .................$544,575 61 | | |
| Stocks and bonds ..................... 70,500 00 | | |
| Mortgages ......... .................. 69,500 00 | $684,725 61 | |
| Furniture and fixtures .......................... | 10,488 88 | |
| Expenses paid ................................. | 12,403 02 | |
| Due from banks and bankers........... 57,760 53 | | |
| Cash and checks for clearing house..... 37,712 56 | 95,473 09 | |
| | $803,090 60 | |

LIABILITIES.

| | | |
|---|--:|--:|
| Capital stock ...... ............................ | $250,000 00 | |
| Surplus ...... ................................. | 250,000 00 | |
| Interest and exchange .......................... | 10,682 85 | |
| Individual deposits ...................$212,202 06 | | |
| Savings deposits ...................... 23,597 18 | | |
| Certificates of deposit ................. 46,223 00 | 282,022 24 | |
| Certified checks ............. ........... $8,534 89 | | |
| Cashier's checks ...................... 1,850 02 | 10,385 51 | |
| | $803,090 60 | |

. "I hereby certify that the above statement is correct.
                                   J. V. PIERCE, *Cashier.*
    "Subscribed and sworn to before me, a notary public in and for Cook county, State of Illinois, this first day of February, 1906.
                           CHARLES A. SAWTELLE, *Notary Public."*

The seventh count is the same as the sixth, except it was alleged that the intended victim of the conspiracy was

the "general public." The eighth count is a statutory count, based upon section 46 of the Criminal Code, and does not contain the inducement set out in the other counts, neither does it set out the false pretenses. The ninth count is the same as the eighth, except it concludes "contrary to law," etc. The fourth count differs from the other counts in this: that it charges the defendants with conspiring together to make certain false representations in regard to the bank, with the intent to cheat the stockholders, depositors and creditors of the bank.

It will be observed that all the counts of the indictment are based upon the theory that the conspiracy consisted of a fraudulent design and agreement to obtain money or property by false pretenses or to cheat and defraud by false pretenses, and that the victims of the conspiracy were the public generally, or the stockholders, depositors, creditors or customers of the bank, and that no conspiracy is alleged to have been formed to wrongfully organize a bank, although the organization of the bank illegally is averred to have been one of the false pretenses resorted to by the defendants, and through which they sought to obtain the money and property or to cheat and defraud the public or the persons who might become stockholders, depositors, creditors and customers of the bank after it was organized.

There is but little, if any, conflict in the testimony, as the plaintiffs in error introduced no evidence of importance except the testimony of certain character witnesses, as they evidently relied upon the trial, as a defense, mainly upon the inability of the prosecution to make a case against them.

It appears that Abner Smith is a lawyer by profession and that he had served for a number of years as a circuit judge in Cook county, and had, after he left the bench and up until shortly before he entered upon the enterprise of organizing the Bank of America, been in the real estate business; that Gustave F. Sorrow had been in the real estate business, the drug business and had some experience

as a corporate promoter; that Jerome V. Pierce had been credit man for a wholesale drug house in the city of Chicago, and by reason of that connection had a large acquaintance among the retail druggists of the city of Chicago, and that Frank E. Creelman was in the wholesale lumber business and had organized and promoted a number of business enterprises. It further appears that in the summer of 1905. Sorrow conceived the idea of organizing a bank in the city of Chicago under the statute then in force in this State; that one principal feature of the bank which he urged in its favor was the establishment of branches (which should receive deposits and issue drafts in small amounts) in the several retail drug stores in the city of Chicago and its suburbs; that in the fall of that year Sorrow interested Smith, Pierce and Creelman in the enterprise; that neither Sorrow, Smith, Pierce nor Creelman had had any experience in the banking business; that to supply their want of experience in that branch of business they joined with them in the enterprise one R. H. Howe, who had had some experience in book-keeping and as a note teller in one of the banks in the city of Chicago. The project as finally agreed upon was to organize a bank to be known as the Bank of America, with a paid up capital of $500,000, $250,000 of which was to be represented by the stock, which was to consist of twenty-five hundred shares of the par value of $100 per share, and a surplus of $250,000, or $100 per share,—that is, the stock was to be subscribed for at $200 per share. Subscription books were opened, and Sorrow subscribed for one hundred and twenty-five shares, or $25,-000 of the capital stock of the bank; Pierce subscribed for one hundred and twenty-five shares, or $25,000; Creelman subscribed for two hundred and fifty shares, or $50,000, and Smith subscribed for twelve hundred and fifty shares, or $250,000, the total amount of their subscriptions aggregating seventeen hundred and fifty shares, or $350,000 of the capital stock of the bank. The balance of the stock was

to be sold to the public at $200 per share, $100 per share being for the stock and $100 per share was to be placed to surplus.

On the 29th day of November, 1905, there was a meeting of the stockholders, at which it was represented by Pierce that the stock was over-subscribed to the extent of $135,000. At that meeting a board of fifteen directors was elected by the stockholders, of which Sorrow, Smith, Pierce, Creelman and Howe were members, and the board of directors immediately elected Smith president, Sorrow vice-president, Pierce cashier and Howe assistant cashier. On the morning after said meeting, Sorrow, Smith, Pierce and others signed and swore to an affidavit which stated that the capital stock of the proposed bank was $250,000 and that all of its capital stock had actually been paid in in cash. The evidence shows, however, that at that time there was only $231,000 paid in in cash on the stock subscriptions against which checks or some other evidence of indebtedness had not been issued, and that of that amount $115,500 belonged in the surplus account. The falsity of the affidavit was therefore clearly known to Sorrow, Smith and Pierce, and probably to Howe. The other directors who signed the affidavit evidently relied upon what they were told in regard to the stock being subscribed and paid for by plaintiffs in error and Pierce, who controlled the organization.

On the second day of December, 1905, an agent of the Auditor of State was in Chicago with the charter of the Bank of America. In company with Smith and Pierce, who had been elected president and secretary of the bank, he went to the banking house of the State Bank of Chicago, where the funds of the Bank of America were on deposit. A check for $250,000 was drawn against that fund and delivered to the agent of the Auditor of State. He drew the funds from the bank and counted them and then delivered the charter of the Bank of America to Smith and Pierce and the funds were re-deposited with the State Bank of

Chicago. The Bank of America had at this time on deposit with the State Bank a little upwards of $270,000 in cash, and the evidence fails to show that anyone outside of Sorrow, Smith and Pierce knew that one-half of that sum belonged in the surplus account or that checks against that fund issued by the officers of the Bank of America were outstanding. Sorrow, Smith and Pierce knew, however, that one-half of the said fund was paid in as surplus, and Pierce before that time, as cashier of the bank, had issued a cashier's check for $40,000 against said fund, which he had delivered to Creelman or his agent, and this check was outstanding at the time that the check for $250,000 was delivered by Pierce and Smith to the agent of the Auditor of State and at the time that the charter of the Bank of America was delivered to Smith and Pierce.

On the fourth day of December, 1905, the Bank of America opened its doors for business, with Smith as president, Sorrow as vice-president, Pierce as cashier and Howe as assistant cashier, who were in active control of the bank. At the time the bank was opened for business printed matter was circulated by the officers of the bank, and notices were published in the daily papers in Chicago, and signs were placed upon the windows of the building occupied by the bank, stating that the bank had a capital of $500,000 fully paid up. Sorrow, Smith, Pierce and Howe clearly knew at that time that the statements were false. The Bank of America ran for seventy-three days, went into the hands of a receiver, and, while the depositors were paid in full, the stockholders of the bank, outside of Smith, Sorrow, Pierce and Creelman, lost $175,000 during that time. It will be remembered that Sorrow, Smith, Pierce and Creelman were subscribers for seventeen hundred and fifty shares of the stock of the bank at $200 a share, or an aggregate of $350,-000 of stock and surplus. The evidence shows that Sorrow never paid anything on his stock subscription, but that the day after the bank opened for business he received a

cashier's check for $4000, which was credited to his open account; that Pierce paid for his stock with money which he borrowed of a relative, and that the loan was re-paid out of the funds of the bank on the day it opened for business, a note being substituted for that amount; that Creelman paid $10,000 in cash on his stock and deposited a certified check of a Chicago bank for $40,000 in payment of the balance of his stock subscription, which certified check was secured by a cashier's check issued by Pierce to Creelman for $40,000, which cashier's check was issued before the bank was organized and was paid by the Bank of America on the day it opened up for business, Creelman's notes being substituted for the amount of that check; that Smith paid for his stock with $25,000 in cash which he had obtained by a loan from the State Bank of Chicago upon a deposit of stock of the Bank of America (which was probably issued before the bank was organized) for which he had not paid, and subsequently that loan was secured by collateral held by the bank which belonged to a customer of the bank and not to Smith, and a part of which loan was subsequently paid by the bank. The balance of his stock subscription was paid by delivering to the bank worthless promissory notes, which were in the vaults of the Bank of America when the bank went into the hands of the receiver and which notes were characterized by Pierce in his evidence as "trash." After the statements hereinbefore referred to were issued, solicitors were sent out by the officers of the bank to secure subscriptions to the capital stock and to obtain deposit accounts, and as late as January 19, 1906, Smith sold $10,000 worth of bank stock to W. B. Martin at $200 per share, and Joseph Beifeld bought about that time fifty shares of stock for $9250, and on February 1, 1906, Pierce, as cashier, issued a statement which showed the bank had a deposit account of $282,022.24 and loans and discounts to the amount of $544,575.61.

U. P. SMITH, (A. N. WATERMAN, of counsel,) for plaintiff in error Abner Smith.

STEDMAN & SOELKE, for plaintiff in error Gustav F. Sorrow.

WILLIAM H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (HOBART P. YOUNG, of counsel,) for the People.

Mr. JUSTICE HAND delivered the opinion of the court:

It is first contended that the indictment is insufficient in this: that the several counts thereof do not set forth the means whereby the conspiracy was to be accomplished and carried into effect. The rule in this State is, that where the object of a conspiracy is unlawful,—that is, where the conspirators agree together do an unlawful act,—it is not necessary in the indictment to set out the means whereby the conspiracy was to be accomplished and carried into effect; that it is only necessary to set out the means to be used for its accomplishment when the conspiracy is to do a lawful act but unlawful means are to be used to carry it into effect. (*Chicago, Wilmington and Vermilion Coal Co.* v. *People,* 214 Ill. 421.) Eight counts of this indictment charge a conspiracy to obtain money or other property by false pretenses and one count of the indictment charges a conspiracy to cheat and defraud by false pretenses. It is illegal at the common law to obtain money or property, or to cheat and defraud, by means of false pretenses; (12 Am. & Eng. Ency. of Law,—2d ed.—p. 794; 19 Cyc. p. 386; 2 Bishop on Crim. Law,—7th ed.—chap. 10;) and section 46 of the Criminal Code of this State makes it a criminal offense for two or more persons to conspire or agree together to obtain money or other property by false pretenses, and section 96 of the Criminal Code makes it a criminal offense to cheat or defraud another by any false

pretense. If, therefore, it were held that the several counts of this indictment did not set out the false pretenses which were to be used as a means to accomplish the objects of the conspiracy charged in the indictment we would be of the opinion the indictment was sufficient. We think, however, that all the counts of the indictment, excepting the eighth and ninth, do set out the false pretenses which were to be used as a means to accomplish the object of the conspiracy, with sufficient particularity. The statute provides, and in *Tedford* v. *People,* 219 Ill. 23, this court said, (p. 26): "Every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes creating the offense, or so plainly that the nature of the offense may be easily understood by the jury." Clearly, seven counts of this indictment state the facts so plainly that the nature of the charge might be clearly understood by the jury.

In *Johnson* v. *People,* 22 Ill. 314, the indictment charged that the defendants, "wickedly and unjustly devising and intending one Joshua B. Casey to defraud and cheat of his goods and property, did then and there falsely and fraudulently conspire, combine, confederate and agree together, among themselves, to get and obtain, knowingly and designedly, by false pretenses, of the said Joshua B. Casey, one horse of the value of $600," with the intent to defraud and cheat him of the same, and the court, in disposing of the question as to the sufficiency of this charge in the indictment, on page 316, said: "The first question presented is whether the court erred in overruling the demurrer to the indictment. Our statute has declared it to be an offense to obtain goods by false pretenses, and 'undoubtedly, as obtaining goods by false pretenses is a statutory misdemeanor, conspiracies to effect them are indictable.' (Wharton on Crim. Law, 674.) This is the common law rule, and brings this indictment clearly within the provisions of the 169th section, chapter 30, R. S. 182, which provides that all of-

fenses not enumerated in that chapter shall be punished by fine and imprisonment, in the discretion of the court, limiting the fine to not more than $100 and the imprisonment to not exceeding six months. It is likewise insisted that the offense is not sufficiently charged; that the means intended to be employed for the purpose of obtaining the property are not specified in the indictment and do not show an indictable offense. No judge ever doubted that a conspiracy to cheat is an offense, as much as a conspiracy to commit larceny, robbery or other crime. The means agreed to be employed by defendants in such cases may never have been disclosed and could not therefore be stated, and yet the offense would be complete and may be proven by overt acts and other circumstances. The very nature of the offense would, as a general thing, render it impossible for the prosecutor to ascertain and prove the means agreed to be employed. We think the charge contained in this indictment clearly describes an offense at the common law, and that the demurrer was properly overruled."

In *Smith* v. *People,* 25 Ill. 9, on page 13, it was said: "We may safely assume that it is indictable to conspire to do an unlawful act by any means, and also that it is indictable to conspire to do any act by unlawful means. In the former case it is not necessary to set out the means used, while in the latter it is, as they must be shown to be unlawful.   *   *   *   If the term 'unlawful' means criminal, or an offense against the criminal law, and as such punishable, then the objection taken to this indictment is good, for seduction, by our law, is not indictable and punishable as a crime, but by the common law governing conspiracies the term is not so limited, and numerous cases are to be found where convictions have been sustained for conspiracy to do unlawful acts although those acts are not punishable as crimes."

In *Thomas* v. *People,* 113 Ill. 531, the indictment charges that the defendants "feloniously, fraudulently and

deceitfully did conspire and agree together, with the fraudulent and malicious intent then and there, feloniously, wrongfully and wickedly, to obtain one horse of the value of $75," and other property, (describing it,) from one Kate Carberry, "by false pretenses,· and to cheat and defraud her, the said Kate Carberry, of the same, contrary to the statute and against the peace and dignity of the same people of the State of Illinois." The false pretenses were not set out. It was urged that the indictment was not good because the false pretenses were not specified. The court sustained the indictment, and said (p. 536) : "The first count, under the ruling in this State, whatever may be decided elsewhere, is clearly good. To obtain goods by false pretenses is, to every apprehension, an illegal act; and the rule here is, where the act to be accomplished by the conspiracy is illegal, it is unnecessary to specify the means by which it was intended to be accomplished. (*Johnson* v. *People,* 22 Ill. 314; *Smith* v. *People,* 25 id. 9; *Cowen* v. *People,* 14 id. 348.) The first count in the present indictment is, in substance, identical with the count in *Johnson* v. *People, supra,* and which is there held to be good."

In *Chicago, Wilmington and Vermilion Coal Co.* v. *People,* 214 Ill. 421, the defendants were charged with conspiracy, and agreeing together to do an illegal act injurious to the public trade by entering into and becoming parties to a pool, trust and agreement to wrongfully and illegally fix the price of coal. The means were not set out in the indictment. The court, on page 440, said: "Those counts charge that the object of the conspiracy was unlawful, and not that its object was lawful and the means for its accomplishment unlawful. It was therefore unnecessary to set out the means whereby the conspiracy was to be accomplished. (*Thomas* v. *People,* 113 Ill. 531.) Neither was it necessary that the object of the conspiracy constitute an offense against the criminal law for which an individual might be indicted and convicted, (*Smith* v. *People,* 25 Ill.

9,) but if the object thereof was unlawful said counts sufficiently charge a conspiracy at common law."

If any one count of an indictment is good it is sufficient to sustain a conviction. (*Thomas* v. *People, supra; Lyons* v. *People,* 68 Ill. 271; *Ochs* v. *People,* 124 id. 399.) In the *Ochs case,* on page 414, it was said: "Whether there is anything of substance in this variance we need not consider, for even if the count be defective that would be of no avail, it being the well settled principle that a conviction on a general verdict will be sustained although some of the counts are faulty, if there be one good count in the indictment.—*Hiner* v. *People,* 34 Ill. 297."

It is next urged the indictment does not sufficiently point out the person or persons who were sought to be unlawfully deprived of their money or property. Some counts charge the victims of the conspiracy to be the public, and others the stockholders, depositors, creditors and customers of the bank, who were ignorant of the true condition of the bank. In order to establish an offense by proof it was not necessary to show that the conspiracy was formed for the purpose of cheating or by false pretenses obtaining the money or property of any particular individual, but it was sufficient to show an unlawful combination to obtain the money or property of any person belonging to the class known as the public, or the money or property of any person who, as a stockholder, depositor, creditor or customer of the bank, might be a victim of the unlawful designs of the conspirators. As it was not necessary to prove that the conspiracy was formed to cheat or defraud a particular person in order to show the guilt of the plaintiffs in error, it was not necessary to aver in the indictment that the conspiracy was formed against any particular person. We think, therefore, the indictment was not defective in the particular pointed out.

It is also said that the parties to the conspiracy are improperly described in the indictment, it being urged that

Robert H. Howe was in the conspiracy, and that as that fact was known to the grand jury he should have been specifically named in the indictment and not been referred to under the general description that he was unknown to the grand jury. This phase of the argument proceeds upon the hypothesis that the persons who enter into a conspiracy so form a part of the offense as to be descriptive of the offense, and that a misdescription of the parties who are engaged in a conspiracy is fatal. The logic of this position is, if too many or too few are named in the indictment there must be an acquittal of all. This cannot be the law. Clearly, if three persons are named in an indictment as conspirators two may be convicted and one acquitted, and if two or more are named in the indictment it would be no defense to prove that someone not named in the indictment was a party to the conspiracy. We are satisfied the great weight of authority is to the effect that the persons engaged in a conspiracy are not so far a part of the offense as to be said to be descriptive of the offense, and the fact that a conspirator is designated in the indictment as unknown when he is known to the grand jury is not fatal to a conviction. *People* v. *Mather,* 4 Wend. 229; *Graff* v. *People,* 208 Ill. 312; *Cooke* v. *People,* 231 id. 9; *Clune* v. *United States,* 159 U. S. 590; McClain on Crim. Law, sec. 981; Joyce on Indictments, sec. 354; *Commonwealth* v. *Edwards,* 135 Pa. St. 474; *Cohen* v. *United States,* 157 Fed. Rep. 651; *United States* v. *Miller,* 26 id. 1255; *People* v. *Richards,* 76 Cal. 412.

It is also urged that the court erred in refusing defendants a bill of particulars. The counts of the indictment, with the exception of the eighth and ninth, were sufficiently specific to apprise the defendants fully of the offense with which they were charged and sufficiently set out the means whereby the object of the conspiracy was to be accomplished, and as no evidence was offered under the eighth and ninth counts of the indictment which was not properly

admissible under the other counts of the indictment, no harm resulted to the defendants by the refusal of the court to grant to them a bill of particulars. The court has a wide discretion in granting or refusing to grant a bill of particulars. *DuBois* v. *People*, 200 Ill. 157; *Gallagher* v. *People*, 211 id. 158.

It is also urged that the court erred in ruling upon the evidence. While the court may have committed some technical errors in the course of the long trial had in this case in its rulings upon the admission or rejection of evidence, we are unable to say that any reversible error was committed.

It is finally contended that the evidence is insufficient to sustain the verdict. We think it clear that the plaintiffs in error, with Pierce and others, formed a scheme to organize a bank under the State law in the city of Chicago, and to obtain a majority of its stock, and to elect themselves officers thereof, and to control the funds which should be paid into the bank, without putting into the bank but a very little, if any, of their own money. This was clearly unlawful, as under the statute then in force (Hurd's Stat. 1905, chap. 16a, sec. 5, p. 201,) the capital stock of the bank must be paid for in cash, and in order to carry out such unlawful scheme the plaintiffs in error, with others, proposed first to sell the stock at $200 per share, $100 per share of which should be treated as surplus. This was done, we think, to raise a fund in cash from the amount paid in by the *bona fide* subscribers on stock sufficient to exhibit to the Auditor of State to enable them to obtain a charter, as without a charter they could not carry into effect their scheme. This part of the scheme was carried into effect before the bank was organized. The second step in the scheme was to draw out of the bank, so soon as it was organized, in payment of checks or by way of loans, all the money which the plaintiffs in error and their co-conspirators had put into the bank in payment of the stock subscribed for by them and to sub-

stitute in lieu thereof in the bank worthless securities. This was also done as soon as the bank was open for business. The third step in the scheme was to obtain for themselves more than one-half of the capital stock of the bank which they represented had been paid for in full and thereby to obtain control of the management of the bank. This they also accomplished. It is said by the plaintiffs in error, and it is urged by their counsel, that the plaintiffs in error did all this innocently and without the design to defraud the public or anyone connected with the bank, and that the losses which followed the organization of the bank were due to the inexperience and ignorance of the plaintiffs in error and their associates. It can hardly be presumed, without evidence, that the plaintiffs in error and those persons intimately associated with them in the organization and management of the bank supposed, under the law, that they could legitimately, by the manipulations hereinbefore referred to, within a few days lawfully create $350,000 in wealth, which it seems to be contended they thought they had done. On the contrary, it is obvious, we think, that the plaintiffs in error and their intimate associates realized that if the other stockholders in the bank knew that they were not paying for their stock, such other subscribers would not readily put into the enterprise $200 in cash per share for the stock which they had subscribed for, hence it was necessary that they state to the other stockholders that the stock had all been subscribed for and paid for in cash, and even to swear to that statement. They also must have realized that prospective purchasers of the stock which they held and which they were subsequently trying to sell even up to within a few days before the bank went into the hands of the receiver, and prospective customers of the bank, would not purchase their stock or deposit funds in the bank if they knew that less than one-half of the stock liabilities due the bank had been paid to the bank. Hence the plaintiffs in error, in connection with their intimate associates in

the bank, advertised that the bank had a paid-in capital of $500,000. We are also impressed with the view that the plaintiffs in error did not believe it was legitimate banking to pay their stock subscriptions due the bank with worthless notes, as in their bank statement made on the first day of February, 1906, they scheduled said notes among their resources as loans and discounts. We think, therefore, the jury were justified in finding, upon the evidence found in this record, that the plaintiffs in error were guilty of the offense charged against them in the indictment returned against them.

Finding no reversible error in this record the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*