The People of the State of Illinois, Defendant in Error, v. Frank J. Link and John T. Miller, Plaintiffs in error.

Gen. No. 36,921.

Opinion filed November 20, 1935.

JOHN L. McINERNEY, of Chicago, for plaintiffs in error; BERNHARDT FRANK, of Chicago, of counsel.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; EDWARD E. WILSON, HENRY E. SEYFARTH and JOHN T. GALLAGHER, Assistant State's Attorneys, of counsel.

PER CURIAM.

By this writ of error it is sought to review the judgment of the criminal court of Cook county, wherein it was adjudged by the court that Timothy J. Crowe, Frank J. Link, John T. Miller and Martin Edelstein were guilty of the crime of conspiracy in manner and form as charged in an indictment against them and others. Crowe and Link were sentenced to the penitentiary for a term of years not to exceed the maximum fixed by statute for the crime of conspiracy, Miller was sentenced to a term of six months in the house of correction together with a fine of $2,000, and Edelstein to a term of three months in the house of correction together with a fine of $2,000. Crowe died since the suing out of the writ of error herein, and the writ as to him has been dismissed. Edelstein entered a motion in the trial court to vacate the judgment, and for a new trial, which motions were allowed, and the indictment was thereafter *nolle prossed* as to him. The surviving plaintiffs in error are Frank J. Link and John T. Miller. Other defendants included in the indictment were found not guilty.

At the June term of the criminal court of Cook county for the year 1931, an indictment was returned by the grand jurors of Cook county against Timothy J. Crowe, Frank J. Link and certain other named members of the then board of trustees of the sanitary district of Chicago, together with certain employees of the district, including John T. Miller, Timothy J. Connolly and Martin Edelstein, upon a charge of conspiracy. Connolly was not apprehended. The indictment contained nine counts, of which six were quashed, and the trial was had upon counts one, three and seven. The first count charges that the persons named, conspired together and with divers other persons whose names were to the grand jurors unknown, with the fraudulent and malicious intent to wrongfully, wick-

edly and unlawfully obtain from the sanitary district of Chicago, a municipality and a body corporate and politic, a large sum of money, to wit, $5,000,000, lawful money of the United States of America, the funds, money and property of the sanitary district of Chicago, by false pretenses. Count three charges that the named conspirators conspired together and with divers other persons whose names were to the grand jurors unknown, to divert $3,000,000 from the use of the sanitary district of Chicago to certain persons by procuring the district to pay to said persons divers large sums of money under the fraudulent and false pretense, that the said persons and each of them were then and there performing work, services and labor for the district and that the district was indebted to said persons therefor when in truth the said persons were not performing and had not performed any services, work or labor for the district, and the district was not indebted to them and to thereby divert $3,000,000 from the purposes of the district and to thereby defraud the district. Count seven charges that the persons named, conspired together and with one George L. Chamberlain and with divers other persons whose names were to the grand jurors unknown, to let and award certain contracts at an exorbitant, extortive, unreasonably high and excessive price and cost to said sanitary district of Chicago and at a price and cost greatly in excess of what the aforesaid contracts and each of them could have been and could be let and awarded to responsible persons, firms and corporations desirous of being awarded said contracts, and at a price and cost greatly in excess of what the same could have been and could be let and awarded for at competitive bidding, to thereby defraud the district. In each count it is recited that the alleged conspiracy was entered into on December 6, 1928. The indictment was returned into open court on the 5th day of June,

1931. Defendants had previously been indicted on May 29, 1930, for the same alleged offenses as those charged in the indictment of June 5, 1931. The former indictment contained the same number of counts as the last indictment, all of which counts in the first indictment were either quashed or *nolle prossed.* The latter indictment, upon which the trial was had, recites in each count thereof that the defendants are there indicted on the same charge as is made in the indictment returned on May 29, 1930.

It is insisted by the defendants that the indictment upon which the trial was had is duplicitous, for the reason that each count in the pending indictment sets forth in *haec verba* the former indictment, and states that the offense charged in the pending indictment is the same crime and offense as charged in the former indictment. The purpose of this allegation in each count of the indictment upon which the trial was had, is apparent.

The Criminal Code of Illinois (Cahill's Illinois Revised Statutes 1933, ch. 38, ¶ 657, p. 1077) contains the following provision:

"When an indictment, information or suit is quashed, or the proceedings on the same are set aside, or reversed on writ of error, the time during the pendency of such indictment, information or suit, so quashed, set aside or reversed, shall not be reckoned within the time limited by this Act, so as to bar any new indictment, information or suit for the same offense."

In Judicial and Statutory Definitions of Words and Phrases, 2nd Series, Volume 2, page 189, we find the following: " 'Duplicity' in an indictment or information is the joinder of two or more distinct offenses in one count." *State v. Sherman,* 137 Mo. App. 70. (Citing 1 Bish. Cr. Proc. (3d Ed.) par. 432.) There is no joinder of distinct offenses in either of the counts upon which the trial was had. The word "same," as used

in the latter indictment, has a very distinct meaning, and can only apply to a similar charge contained in the indictment returned May 29, 1930. We are of the opinion that the method adopted in drawing the indictment, was proper, and did not make it duplicitous. See *Swalley v. People,* 116 Ill. 247.

The record indicates that the hearing of the cause was had before three judges of the criminal court of Cook county sitting together, without a jury, and defendants urge that the respective judgments, sentences and fines are illegal and void in that they were entered by a branch of the criminal court composed of three judges sitting *en banc.*

Immediately after the court made its finding that the defendants were guilty, a motion for a new trial was made by the attorney for the defendants in the following language: "We would like to enter a motion as to all the defendants who have been found guilty for a new trial." No grounds for a new trial were urged, and the motion was denied. Following the motion for a new trial, counsel for defendants made a motion in arrest of judgment without stating any grounds therefor, which motion was denied. Thereafter, and on the same date, motions were made by counsel for defendants to vacate the judgments and the sentences, without stating any grounds therefor, which motions were both denied.

The placita to the record filed in the cause here is as follows:

"UNITED STATES OF AMERICA

"State of Illinois } ss
Cook County }

"Pleas, before a branch of the Criminal Court of Cook County, in said County and State, at a term thereof begun and held at the Criminal Court House, in the City of Chicago, in said County, on the first Monday

(being the first day) of February in the year of our Lord one thousand nine hundred and thirty-two and of the Independence of the United States the one hundred and fifty-sixth.

"Present: Honorable Harry M. Fisher Judge of the Circuit Court of Cook County, and Ex-Officio Judge of the Criminal Court of Cook County.

"John A. Swanson State's Attorney

"William D. Meyering Sheriff of Cook County

"Attest: George Seif Clerk"

The initial recital in the bill of exceptions is as follows:

"Be It Remembered, that heretofore, to-wit, on the 25th day of November, A. D. 1931, being one of the days of said term of said court, before the Honorable Harry M. Fisher, judge of the Circuit Court of Cook County, ex-officio judge of the Criminal Court of Cook County, and Judges John Prystalski and James J. Kelly, both judges of the Superior Court of Cook County and ex-officio judges of the Criminal Court of Cook County, the latter two named judges acting in an advisory capacity, without a jury, a jury having been waived by counsel for the respective parties, this cause came on for trial upon the indictment heretofore found herein, the defendants (other than Timothy J. Connolly who was not on trial) having each entered a plea of not guilty." The bill of exceptions was signed by Harry M. Fisher, judge of the criminal court of Cook county.

Prior to the hearing, and before the court heard evidence, the record shows that the following occurred:

"Mr. Northup: (Assistant State's Attorney) Let the record read, then, that the defendants, all being in court, waive any and all objections of advantage which may be taken of the fact that the Chief Justice of this

court is presiding in this trial and being advised, or two of the associate judges are sitting in advisory capacity, so that no question can be raised on the record hereafter on an appeal," etc.

"Judge Fisher: Let the record so show."

"Mr. Northup: (Assistant State's Attorney) If the court please, I presume at this time that all of the defendants outside of Mr. Lawler are in court, which has not been true, I think, before, and I think that each defendant in his own person as well as by counsel ought to waive any objection to the hearing of this case before your Honor with two other members of the bench sitting in an advisory capacity, for the purpose of our record."

"Judge Fisher: They have already done that. Is there any objection to repeating the waiver?"

"Mr. Fink: (Counsel for all defendants) None at all."

The record indicates clearly that the defendants, John T. Miller and Frank J. Link were before the court at this time, and that the method of trial had been and was agreed to by them.

The judgment in the case entered on February 5, 1932, contains, among others, the following recitations:

"Before Hon. Harry M. Fisher, Hon. John Prystalski and Hon. James J. Kelly, sitting *en banc*. Judgment. And the Court being fully advised in the premises doth find the said defendants, John J. Tuohy, James N. Whalen and August M. Miller not guilty.

"And the Court doth find the said defendants, Timothy J. Crowe, Frank J. Link, John T. Miller and Martin Edelstein guilty of conspiracy, etc. in manner and form as charged in the indictment. . . .

"Therefore, it is ordered and adjudged by the Court that the said defendants, Timothy J. Crowe and Frank J. Link be and they hereby are sentenced to the peni-

tentiary of this state at Joliet for the crime of conspiracy in manner and form as charged in the indictment whereof they stand convicted, for a term of years not to exceed the maximum term fixed by statute for the crime whereof they stand convicted, and it is further ordered and adjudged that the said defendants Timothy J. Crowe and Frank J. Link be taken from the bar of the Court to the common jail of Cook County, and from thence by the Sheriff of Cook County to the penitentiary of this state, at Joliet, and be delivered to the Warden or Keeper of said penitentiary and the said Warden or Keeper is hereby required and commanded to take the bodies of the said defendants Timothy J. Crowe and Frank J. Link and confine them in said penitentiary according to law, from and after the delivery thereof until discharged according to law, provided such term of imprisonment in said penitentiary shall not exceed the maximum term for the crime for which the said defendants were convicted and sentenced.

"It is further ordered that the said defendants pay all the costs of these proceedings, and that execution issue therefor.

"Defendant, John T. Miller sentenced on finding to the House of Correction for a term of six (6) months, Two Thousand ($2,000.00) Dollars fine and costs.

"It is further considered, ordered and adjudged by the court that the said defendants John T. Miller and Martin Edelstein be each fined in the sum of Two Thousand ($2,000.00) Dollars and pay all the costs of these proceedings. . . ."

In *Hall v. Hamilton,* 74 Ill. 437, a judgment was entered on a note which contained a warrant of attorney by virtue of which the judgment was confessed, and which authorized the entrance of the appearance of the defendant, the waiver of process and confession

of judgment. There was a further agreement that a *cognovit* for the amount due might be filed, and there was also an agreement that no writ of error should be prosecuted or appeal taken, and a provision that all errors were released. On appeal a similar question as to the personnel of the court was presented as is presented here, and the court said:

"In this case the *placita* to the record shows that three of the judges of the Superior Court were present, as also two circuit judges. If the record is true in this regard, then the decision of all questions was submitted to five judges instead of but one, as contemplated by the law. If that number sat and decided questions, they may have been decided by three of the five, and the decision different from what it would have been had but one judge sat. Hence such an organization of the court is not such as litigants are entitled to have when their causes are tried.

"But the court thus organized is not without jurisdiction. Either of the five judges had jurisdiction to try any and all causes, and the association of the others with him did not detract from or deprive him of the jurisdiction vested in him by the constitution and the statute. The *placita* to all records in that court, and to transcripts to this court, should show that one judge sat on the trial, who it was, and that he was holding a branch court. But being only error, which may be waived or released, plaintiff in error released it with all others by the *cognovit* filed by his attorney in fact."

A special concurring opinion by Justice Scott in which Justice Sheldon joined, was filed in the cause, and is as follows:

"The Superior Court of Cook County is composed of three judges, and it is proper the *placita* should show how many of them may be present on the day fixed by law for the convening of the court, or at any

other time during the term. This is all the office the *placita* performs. The proceedings are to be had in the Superior Court, and hence any order made by either of the judges in the trial of the cause will be presumed to be authorized by law. Commonly, the bill of exceptions will show before which judge the cause was tried. The fact the clerk in making up the transcript may certify that any particular number of judges were present, cannot vitiate the record. It is sufficient if it shall appear by the record the cause was heard before either of the judges of the Superior Court, or any other judge authorized by law to hold a branch of that court.''

In *Holland v. People,* 132 Ill. App. 449, the plaintiff in error was charged with assault and battery, a misdemeanor, as is the case here. It is stated in the opinion in that case that ''counsel for defendant stated in open court in the presence of the defendant that it would not be possible for him and the defendant to be present the next morning, and consented that the jury should be instructed without either of the parties or counsel being present, and requested the court to explain to the jury the reason for their absence.'' The jury returned a verdict finding the defendant guilty of an assault. A fine was imposed by the court, to which the defendant objected. Further, in its opinion the Appellate Court said that ''The record in this case shows that the People asked that the jury assess the fine if they should find the defendant guilty, as provided by the statute in appealed cases, and the defendant, by his attorney, thereupon stated that 'the jury should pass solely upon the question of guilt, and if the defendant was found guilty the fine was a matter for the court.' This is only a misdemeanor. *In a misdemeanor, the defendant may waive any of his rights on the trial.* He could have waived trial by jury and could have been tried and found guilty and had a fine

assessed against him by the court. If the defendant can now take advantage of the procedure that the record shows he caused, then the defendant, by his attorney, may intentionally mislead the court and take advantage of his own wrong. A defendant ought not to be permitted to take advantage of the course of procedure which he causes the trial court to pursue. It has been held to be the law that even in cases of felony that a defendant may waive some of his statutory rights, and that he cannot assign error upon what he has consented and agreed to when he is not damaged thereby." Citing *Bow v. People,* 160 Ill. 438; *Bruen v. People,* 206 Ill. 417.

In view of the fact that these defendants consented to this method of trial pursued, and that after they were found guilty, neither in the motion for a new trial, nor in the motion in arrest of judgment, nor in the motion to vacate the judgment, was any question raised as to the jurisdiction of the court, as constituted, we are of the opinion that they waived any question as to the personnel of the court. Further, the record clearly indicates both by the *placita* and by the first paragraph in the bill of exceptions, that the cause was tried before Judge Fisher, and that two other judges sat with him in the hearing. The fact that the clerk in making up the transcript certified that the judgment was the judgment of Judge Fisher and the two other judges, does not vitiate the record.

It is urged that the court erred in refusing to quash count seven, wherein the persons named as conspirators in count one and three are charged with conspiring together and with one George L. Chamberlain, and with divers other persons whose names to the grand jurors were unknown, to let and award contracts at an exorbitant, extortive, unreasonably high and excessive price and cost to the sanitary district of Chicago, and at a price greatly in excess of what such contracts

could have been and could be let and awarded to responsible firms, and at a price greatly in excess of what the same could have been and could be let and awarded for a competitive bidding, for the purpose of defrauding the district. Chamberlain was not indicted.

In *People v. Smith,* 239 Ill. 91, page 107, the Supreme Court said:

"It is also said that the parties to the conspiracy are improperly described in the indictment, it being urged that Robert H. Howe was in the conspiracy, and that as that fact was known to the grand jury he should have been specifically named in the indictment and not been referred to under the general description that he was unknown to the grand jury. This phase of the argument proceeds upon the hypothesis that the persons who enter into a conspiracy so form a part of the offense as to be descriptive of the offense, and that a misdescription of the parties who are engaged in a conspiracy is fatal. The logic of this position is, if too many or too few are named in the indictment there must be an acquittal of all. This cannot be the law. Clearly, if three persons are named in an indictment as conspirators two may be convicted and one acquitted, and if two or more are named in the indictment it would be no defense to prove that someone not named in the indictment was a party to the conspiracy. We are satisfied the great weight of authority is to the effect that the persons engaged in a conspiracy are not so far a part of the offense as to be said to be descriptive of the offense, and the fact that a conspirator is designated in the indictment as unknown when he is known to the grand jury is not fatal to a conviction. *People v. Mather,* 4 Wend. 229; *Graff v. People,* 208 Ill. 312; *Cooke v. People,* 231 id. 9; *Clune v. United States,* 159 U. S. 590; McClain on Crim. Law, sec. 981; Joyce on Indictments, sec. 354; *Commonwealth v. Edwards,* 135 Pa. St. 474; *Cohen v. United States,* 157

Fed. Rep. 651; *United States v. Miller*, 26 id. 1255; *People v. Richards*, 76 Cal. 412.''

We are of the opinion that the court was not in error in entering the order overruling the motion to quash this seventh count in the indictment.

During all the times mentioned in the indictment and in the evidence, Crowe was the president of the sanitary district of Chicago and Link was a member of its board of trustees, and on December 22, 1926, the board of trustees of the sanitary district of Chicago adopted the following rule, which provides that:

''The Committee on Employment shall appoint all employees of the District, and the chairman of said Committee shall certify in writing to the head of the proper department and to the clerk the names of all such employees stating the positions to be filled and the compensation to be paid to such employees. Thereupon it shall be the duty of such head of department and the clerk of the District to include the name of such employee upon the pay roll of the District. The Committee on Employment may suspend heads of departments, providing such suspension is reported to the Board, and may discharge any employee when in its judgment it shall deem it advisable for the good of the service. The head of any department may suspend any employee in his department for cause, and shall report his action in the premises at once to the Committee on Employment. The head of any department, in case of emergency, may temporarily employ such agents and employees as may be required by the work of the District and report his action in the premises at once to the Committee on Employment.''

There was also created by the board of trustees of the sanitary district a ''Department of Permanent Plants and Structures,'' of which the defendant, John T. Miller, was the head. Under this ''Department of Permanent Plants and Structures'' was what was

termed a water meter survey division, and the record shows that in the years of 1926, 1927 and 1928 a large number of persons were placed on the pay roll of the sanitary district of Chicago for the ostensible purpose of making a water meter survey, and that the appointment of these persons all received the approval of the committee of employment and of the board of trustees, after the committee had received an order and direction from Miller to make such appointment. It is in evidence that before the committee on employment placed any of these persons on this pay roll, it was necessary that they receive a letter from Miller as to each one, authorizing this action. Two hundred and ninety one of these so-called employees testified that they were on this water meter survey pay roll, that they received many thousands of dollars in pay, and performed no services whatever. The names of these persons are all set forth in the record. A typical case is that of one J. A. Egelston who testified that he was on this so-called water meter survey pay roll from April 1st to November 15, 1928, at a salary of $200 per month, and that he performed no service for the sanitary district of Chicago, nor did he report for service. This witness also testified that he was so placed on the pay roll at the direction of the defendant Link. The record further shows that there were 162 persons on this so-called water meter survey pay roll, and that each of them received large salaries, and whose services consisted almost entirely of political work, such as copying names from registration lists, addressing envelopes and calling upon certain persons as householders to ascertain whether or not they had water meters in their house, but that their principal work was canvassing for votes for a certain election. During the time mentioned, the record further shows that there were 81 persons employed in the law department of the sanitary district of Chicago, who rendered no

services whatever to the district, and that there were 29 on such law department pay roll who received various large sums of money amounting to many thousands of dollars, and who performed but slight service. A typical case is that of one of them received $10,000 for a period beginning August 1, 1927, and concluding November 30, 1928. This person testified that he worked about 30 or 40 days during the entire period.

In addition to the departments mentioned, there existed in the sanitary district at the times mentioned what was called the Illinois Valley Department, which had to do with suits pending against the sanitary district, brought to recover for alleged damage to lands in the Illinois Valley, said to have been caused by these lands being overflowed by waters from the sanitary district. A large corps of so-called investigators were placed on the sanitary district pay roll at large salaries, and most of them testified that they did little or no work for the district. One typical case is that of a person named Schaeffer, who testified that during the period mentioned, he received $5,000 in salary and $1,448 for expenses, and that he performed no service whatever for the sanitary district of Chicago. A large number of others testified to the same effect. These persons not only received considerable sums in salaries, but in addition, were paid large and extravagant amounts for their alleged expenses. In addition to those mentioned, a great many members of the Illinois General Assembly were placed on the pay roll of the sanitary district of Chicago, all of whom testified that they received pay in large amounts. Very few of them performed any service whatever.

In the summer of 1927, and subsequently, a so-called bridle path was constructed by the sanitary district trustees, along what is known as the North Shore Channel of the Sanitary District. The record indi-

cates that the following amounts were spent on this work:

Cinders, 85,886 yards at $1.90 a yard......$162,866.50
Auto trucks hired...................... 291,175.90
Teams hired........................... 7,712.50
Rental of equipment.................... 131,490.50
Repairs to rented equipment............ 8,458.75
Pay rolls............................. 265,683.35
Materials, equipment and expenses....... 201,474.41

Engineers who computed the amount of work on this bridle path, the cost of materials which entered into its construction, and the entire reasonable cost of the construction thereof, placed their figure at $292,375.08. This evidence seems to have gone into the record without objection, and there was no evidence offered to dispute the figures given. There was no advertisement made for bids based on any estimated cost of the construction of this bridle path, but the work was paid for by vouchers in sums of less than $500 each for the entire work. Some of the cinders were obtained from the 39th Street Pumping Station of the sanitary district of Chicago without cost to the person who furnished them, and were afterwards sold by him to the district. Others were obtained from various industrial plants, and as testified by one Frenzel who did the hauling of the cinders, the district was charged a much larger price than the market price of such commodity at the time and place in question.

Employees of the sanitary district working under the defendant Miller, together with others, organized what was known as the ''City Machine & Engineering Company,'' which institution had its place of business in a real estate office at 3953 Roosevelt Road, Chicago. One Pezman, a machinist, testified that in the year 1926 he entered into the employment of the City Machine & Engineering Company. His duties consisted of repair-

ing pumps and engines, and doing general machinist work for the sanitary district of Chicago. He testified that he employed certain union men to assist him; that he worked for this City Machine & Engineering Company part of 1926 and all of 1927 and 1928; that he received pay checks through the City Machine & Engineering Company from the sanitary district of Chicago; that his work, among other things, consisted of seven or eight days' work at the Glenview Pumping Station, where he and two other men overhauled two pumps; that he and three or four other men worked at the 95th Street Pumping Station overhauling a hydraulic gauge and sewer pump; that he worked for three or four days at Northbrook overhauling sewer pumps, and seven or eight days at Morton Grove on a gasoline engine and sewer pump. He further testified that he and two other machinists worked a week at the Clifton Avenue Pumping Station, and another week at the Wilmette Pumping Station; that he and three other men worked two or three weeks at Elmwood and at the Lawrence Avenue Pumping Station, where he and three or four men worked for three months overhauling steam turbine engines and pumps, and that the vouchers paid to the City Machine & Engineering Company by the sanitary district of Chicago for these various jobs amounted to around $168,000. An engineer, familiar with the character of work done by the City Machine & Engineering Company for the sanitary district, testified that for the work done at the Lawrence Avenue Pumping Station, for which a price of $9,056 was charged the sanitary district, that the reasonable price for such work was $4,310, or an overcharge of $4,756.95; that for certain work done for the sanitary district by the City Machine & Engineering Company, for which the sanitary district paid the sum of $976.62, the reasonable price would be $600, or an overcharge of $376; that for certain work done by this institution

for the sanitary district, and for which the district was charged the sum of $3,249.11, a reasonable price would be $1,580, or an overcharge of $1,669.10; that for certain work done on the 39th Street Pumping Station by this institution, for which a charge of $1,808.91 was made, the reasonable charge would be $1,000, or an overcharge of $808.91; that for certain work done on the Morton Grove Pumping Station, for which a charge of $360.45 was made, the reasonable price would be $200.00, or an overcharge of $160.45; that for certain work done on the Glenview Pumping Station, a charge was made of $2,313.65, a reasonable price being $1,285, or an overcharge of $1,028.65; that for work done on the Elmwood Pumping Station, for which a price of $2,931.45 was charged, the reasonable price for this work was $1,556, or an excess of $1,371.43; that for work done on the Northbrook Pumping Station, for which a price of $2,421.85 was charged, the reasonable price for this work would be $1,150, or an excess of $1,251.85; that for work done on the Desplaines Treatment Plant, for which a price of $11,641.04 was charged, the reasonable price for this work would be $5,907, or an excess of $5,734.04; and that for work done on the Calumet Pumping Station, for which a price of $9,417.48 was charged, the reasonable price for this work would be $5,477, or an excess of $4,040.48. This all appears from the record in the case, and is not disputed by any evidence offered by the defendants. It is stipulated in the record that the City Machine & Engineering Company submitted bills to the sanitary district, for which vouchers amounting to $80,558.34 were paid by the district in the year 1927, and the sum of $47,691.94 in 1928, aggregating a total of $128,250.28.

Many vouchers were issued to a certain institution known as the Evers-Sauvage Engineering Company, for work done under the defendant Miller, and it was shown that in one instance the sum of $10,999.25 was

paid to this institution for work which was, in fact, done by the General Electric Company at a cost of $5,560.73.

The record is filled with many such items of alleged work done under the control and by the direction of Miller and the employees in his department, for which many thousands of dollars were paid by the sanitary district of Chicago by Miller's direction, under circumstances very similar to those mentioned.

In addition to the above mentioned items, the record is replete with cases wherein duplicate, triplicate and quadruplicate payments were made for work done through Miller's department and under his supervision and control, and where the orders for the payment of the work were authorized by Miller. It was stipulated in the trial that the trustees of the sanitary district, which included Crowe, its president, Link, a member, and other trustees, approved the vouchers for the payment of the salaries of all those employed, as well as for work done, as hereinbefore noted. The person who acted as secretary of the committee, Thomas J. Whalen, testified that during these years, the chairman would go over these voucher lists in the presence of the whole board, the roll would be called, and the trustees thereupon voted for their payment.

There was offered and received in evidence a report of an investigation of certain credits in the current bank deposits of the three appealing defendants. That of Crowe amounted to $229,747.01, his wife, $68,750, Frank J. Link and his wife, $99,100, and John T. Miller $103,265.42. The testimony as to these bank accounts was objected to, and its admission is assigned here as error. However, in view of the fact that the case was tried before the court without a jury, whether this evidence was admissible or not, we will indulge in the presumption that the court considered only such evidence as was relevant and proper.

In *Radtke v. People,* 171 Ill. App. 462, this court said:

"The rule is that, on a trial by the court without a jury, no improper or incompetent evidence will be presumed by a reviewing court to have influenced the court in reaching a decision, where there is sufficient proper evidence to justify the judgment. *Merchants' Despatch v. Joesting,* 89 Ill. 152; *Kreiling v. Nortrup,* 215 Ill. 195; *Pratt v. Davis,* 224 Ill. 300. There are also many Appellate Court decisions to the same effect."

Another claim of the defendants is that by proving a number of small and claimed unrelated conspiracies, there can be no conclusion that the defendants are guilty of the acts of conspiracy charged in the indictment. In *Ochs v. People,* 124 Ill. 399, an indictment was returned by the grand jury of Cook county in which it was charged that a number of members of the board of county commissioners of Cook county, together with other persons, were guilty of conspiracy in obtaining money from Cook county by means of false pretenses. It was proved in that case that these commissioners, together with other persons, some of whom were indicted and some of whom were not, had let many fraudulent contracts at excessive rates and in an unlawful manner. The indicted persons were not all shown to have been connected with each of the fraudulent lettings, but it was claimed that there was a general conspiracy to defraud Cook county, and the Supreme Court said:

"In every instance where one of these fraudulent contracts was negotiated for in advance by one of the commissioners, or by some third person, the contract was awarded as had been arranged for, and the commissioners indicted are invariably found voting in favor of the allowance of the false and fraudulent bills rendered.

"Upon an examination of the entire testimony in the case, we can have no doubt that the verdict is fully sustained by the evidence.

"The great contention on the part of the plaintiffs in error is, that though the evidence may tend to show that there were minor conspiracies between certain ones or groups of the accused, it does not show a general conspiracy in which all the plaintiffs in error were engaged, and that whatever the conspiracy may have been, it was not the specific one charged in the indictment.

"As respects the law governing in the proof of a conspiracy, it is stated by Archbold, as follows: 'A conspiracy is proved, either expressly, or by the proof of the facts from which the jury may infer it. It is seldom proved expressly, nor can a case easily be imagined in which that is likely to occur, unless where one or more of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the jury may fairly imply it. It is usual to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring is not improbable; and if to this can be added evidence of any consultations or private meetings between them, then there is a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants in furtherance of the common design. But although the proof above mentioned is desirable, because it satisfies the jury as you proceed, and they are better able to apply the evidence of the overt acts when it is afterwards given, yet it is not essentially necessary, as the jury may imply the conspiracy of all from the overt acts of each.' Archbold's Crim. Pr. and Pl. 619.

"Mr. Greenleaf says: 'The *evidence* in proof of a conspiracy will generally, from the nature of the case, be *circumstantial*. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design, and to pursue it by common means. If it be proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part, and another another part of the same, so as to complete it, with a view of the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of its concoction, for every person entering into a conspiracy or common design already formed, is deemed, in law, a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design.' 3 Greenleaf on Evidence, sec. 92.

"We have quoted thus at large, because what is thus announced seems completely to meet and dispose of the point as to there being conspiracies in groups, and not one general conspiracy, and of the conspiracy being of another kind than the one charged, and of objections on that score to the reception of the evidence of individual acts which was received, and to be in justification of instructions which were given." No evidence was offered or received on behalf of the defendants.

It is insisted that the statute of limitations had run when the new indictment of June 5, 1931, was returned. The statute of limitations, in the prosecution of misdemeanors, is one year and six months. After eliminating the period of the pendency of the old indictment, a computation will show that the return of the new indictment of June 5, 1931, was made well within the limitation period. Further, an examination of the

record indicates that many of the acts done in further-
ance of the alleged conspiracy occurred well within
the limitation period.

We are of the opinion that the finding and judgment
are sustained by the evidence, and that the judgment
should not be disturbed. The judgment is, therefore,
affirmed.

*Affirmed.*