## MITCHELL v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 11, 1916.)

### No. 58.

1. CRIMINAL LAW ⟪═⟫370—EVIDENCE—OTHER OFFENSES—ADMISSIBILITY.

On a trial for conspiracy to violate Food and Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. 1913, §§ 8717–8728), by shipping Caracas coffee misbranded as Bogota coffee, where defendant denied all knowledge of the misbranding and claimed that it was "put over him" by employés acting secretly with coffee brokers through whom an order for the coffee was received, warehouse orders passing through defendant's office and directing the mixing and misbranding of other lots of coffee were admissible as tending to show his knowledge; the court having carefully charged as to the purpose and effect of such evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 825–829; Dec. Dig. ⟪═⟫370.]

2 CRIMINAL LAW ⟪═⟫432—EVIDENCE—DOCUMENTS—PRELIMINARY PROOF.

On a trial for conspiracy to violate the Food and Drugs Act by shipping misbranded coffee, where warehouse orders for the mixing and misbranding of other lots of coffee were admitted as bearing on defendant's knowledge of the misbranding, evidence as to the meaning of initials with which such coffee was marked *held* to make such orders intelligible, so as to render them admissible.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1021; Dec. Dig. ⟪═⟫432.]

3. CONSPIRACY ⟪═⟫43—INDICTMENT—ISSUES, PROOF, AND VARIANCE.

Under an indictment charging defendants with conspiring among themselves and with other persons unknown to ship misbranded coffee in violation of the Food and Drugs Act, the mere fact that third parties testified before the grand jury as to which they did in misbranding the coffee did not show that they were known to the grand jury to be conspirators when the indictment was found, and hence either defendant could be convicted for conspiring with such third persons, though the jury found that the defendants did not conspire with each other.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79, 80, 84–99; Dec. Dig. ⟪═⟫43.]

---

⟪═⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. CONSTITUTIONAL LAW ☞70—LEGISLATIVE POWER—MERGER IN OFFENSES
    COMMITTED.
        Congress having made a conspiracy to commit an offense a distinct
    offense, with a penalty differing from and frequently more severe than
    that imposed for the commission of the act which defendants conspired to
    commit, the claim that it is unfair for the government to prosecute de-
    fendants for conspiracy to commit an offense, when it has proof tending
    to show the commission of the substantive offense, is one to be addressed
    to Congress, and not to the courts.
        [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–
    132, 137; Dec. Dig. ☞70.]

In Error to the District Court of the United States for the South-
ern District of New York.

William L. Mitchell was convicted of an offense, and he brings er-
ror.    Affirmed.

This cause comes here upon writ of error to review a judgment of
conviction, entered in the District Court, Southern District of New
York. William L. Mitchell (the sole plaintiff in error) and Peter J.
Shannon were convicted, under section 37, United States Criminal
Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [U. S. Comp. St. 1913,
§ 10201]), of a conspiracy to commit an offense against the Food
and Drugs Act, in that they conspired on May 20, 1914, to ship from
Brooklyn, N. Y., to Milwaukee, Wis., 84 bags of coffee which should
be then and there adulterated and misbranded, in that the said coffee
should be marked and sold as Bogota coffee, when in fact it was to
be washed Caracas coffee. The indictment charged the two named
defendants with conspiring among themselves and with divers other
persons unknown. Both were convicted; Shannon has not appealed.

George Gordon Battle, of New York City (I. H. Levy, of New
York City, of counsel), for plaintiff in error.

H. Snowden Marshall, U. S. Atty., and Roger B. Wood and B.
A. Matthews, Asst. U. S. Attys., all of New York City.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. Shannon was a coffee broker doing
business as Peter J. Shannon & Co.; William Mitchell was a partner
with his brother George, under the firm name of Mitchell Bros., as
importers and jobbers of tea and coffee. George attended to the tea
side of the business; William to the coffee side.

[1] There are five assignments of error. The first three present
in one form or another the proposition that there was not evidence
sufficient to send the cause to the jury. The fifth refers to the exclu-
sion of certain testimony; as it was not argued orally or on the brief,
it need not be considered. The fourth reads as follows:

"Fourth. The court erred in admitting in evidence, over the objection of
the defendant, evidence of other alleged offenses of misbranding on the part
of the defendant, William L. Mitchell, or on the part of Mitchell Bros.".

This assignment covers the introduction of what are known as Ex-
hibits 18 to 25, inclusive. This fourth assignment may be first con-

sidered. In order to appreciate the precise point thus raised, it will be necessary to set forth much of the testimony in a condensed form.

Heidmann & Co., of Milwaukee, wrote to Shannon, asking him to send them three or four samples of Bogota coffee. He sent them four samples, separately numbered, all described as Bogota at $17\frac{1}{4}$ cents for each sample. Heidmann & Co. selected sample No. 11, 84 bags, and ordered Shannon to get it. Shannon sent them a sales memo. of 84 bags Bogota at 17 cents as sold to them by Mitchell Bros.— also a bill of Mitchell Bros. May 25, 1914, for the same 84 bags Bogota. Eighty-four bags were shipped to them, but were seized on the way as misbranded; the bags were all branded "P. A. L. Bogota," which means Pedro A. Lopez, of Bogota. The samples which Shannon sent were obtained from various chops of Caracas coffee exposed in Mitchell's office; No. 11 was a mixture of two of these chops. The Caracas coffee represented by these samples was the property of Mitchell Bros. and in warehouse. Two chops, amounting in all to 96 bags, were mixed and shipped by Mitchell Bros. in the 84 bags marked "P. A. L. Bogota." An order was sent by Mitchell Bros. to the warehouse to mix these two lots of 38 and 59 bags, respectively, and to put the contents into 84 bags, marked "P. A. L. Bogota."

Upon the books of Mitchell Bros. and in the record of the warehouse the two lots (38 bags and 59 bags) were marked as having come from Caracas. The 84 bags into which the mixed lot was to be put were furnished to the warehouse company by an employé of Mitchell Bros., already marked "P. A. L. Bogota." It is not disputed that Shannon and one or more of Mitchell Bros.' employés, with an intention "to put something over on Heidmann & Co.," did mix these two lots of Caracas coffee, did brand them as "P. A. L. Bogota," indicating that they were from Pedro A. Lopez, of Bogota, and did send them into interstate commerce, thereby violating the Food and Drug Act.

The questions in the case were whether defendant Mitchell knew of this performance, and whether he conspired with the others to have the coffee thus misbranded. There were various bits of proof, from which, according to the government's contention, the jury might infer that the particular single offense against the Food Act was a matter within Mitchell's knowledge and brought about with his procurement. A government inspector also testified that at an interview he had with defendant Mitchell on June 9th (after the coffee was seized) Mitchell told him that, after he had agreed to sell these two lots of Caracas coffee to Shannon's customer (he did not give Shannon's name, but called him merely the broker), the latter told him they would have to be dumped and mixed, and that Shannon would share with Mitchell one-half the cost of this; also that Shannon told him (Mitchell) the bags would have to be marked "P. A. L. Bogota."

Down to the time when the government rested its case there had been no evidence introduced to show other instances of misbranding initiated or carried out in defendant's office. Moreover, with the testimony of the government inspector as to Mitchell's admissions, there was a

prima facie case on which the government was entitled to go' to the jury.

Defendant then took the stand. He denied so much of the story of the inspector as stated that he (Mitchell) had told the latter that Shannon said anything to him about putting the particular lots in P. A. L. Bogota bags. He admitted that the two lots of Caracas coffee (charged as the overt act) had been mixed and packed in bags marked "P. A. L. Bogota," but asserted that this was wholly without his knowledge; that it had been "put over him" by persons in his office, acting secretly with the brokers; and that he was very indignant when he found it out. On cross-examination the government got him to identify a pile of orders to the New York Dock Company (the warehouse company) as having passed through his office signed by Von Thaden, the shipping clerk. They were in the same form as the order (Exhibit 10) directing that the 97 bags of Caracas coffee be dumped, mixed, and bagged as 84 bags Bogota P. A. L., the overt act charged in the indictment. These eight documents were then offered in evidence—they were objected to as incompetent, irrelevant, and not sufficiently proved. The court admitted them, and such admission is the subject of the fourth assignment of error. The trial judge carefully stated his reason for admitting them as follows:

"The purpose is this: As to the transaction in suit the defense of the witness is that he knew nothing about this; that it went through his office without any knowledge upon his part at all as to these nefarious features in the sale of the coffee; that he sold it as Caracas, but he knew nothing about the other transaction. Of course, if they can show that it was not an unusual thing for transactions of that kind to go through his office, it is a circumstance for the jury to determine whether they would be likely to go through his office without this defendant having knowledge of it. It is simply a circumstance for the jury to consider."

Later on, in admitting one of these orders, the court said:

"It is merely evidence of circumstances for the jury bearing on the question whether the transaction involved could likely have gone through the witness' office without his knowledge; evidence bearing on the question of the witness' knowledge."

Still later, when the government undertook to offer other orders similar to the eight (Exhibits 18 to 25), the court said:

"I do not think it is necessary to put in too many instances of this kind. They are only admitted as bearing on the question of the knowledge and intent of this defendant of the transaction in question. He is not on trial for anything involved, except in this present indictment; but in an instance where a question of the intent or knowledge of the defendant as to the particular transaction arises, then you may show similar transactions that would tend to throw light on the question the jury is to determine."

Finally, in charging the jury as to this evidence, Judge Van Fleet said:

"This charge, gentlemen of the jury, has solely relation to the bags disclosed in the evidence and mentioned in the indictment. The other instances that may have been disclosed where similar acts were done were only admitted before you as tending to lay before your mind what the fact was as to the claimed want of knowledge of the defendant Mitchell as to these transactions passing through his office. In other words, unless a case has been

made out which would warrant you, under the principles that I have stated to you, in convicting the defendants upon the charges contained in the indictment in this case, the fact that you may believe that an offense had been committed, with reference to other shipments of coffee than those mentioned in the indictment in this case, would not warrant you in finding a verdict of conviction. Those acts are, as I said, merely to aid you in determining whether one of the defendants, Mr. Mitchell, had knowledge of this particular transaction."

Certainly the jury were most carefully and repeatedly instructed as to the object and bearing of this testimony. Had the case closed when the government's proofs were in, none of this testimony would have been offered, because with the proof of defendant's admission of his knowledge and participation in the misbranding shown as the overt act conviction would naturally follow. It was his own testimony that brought this testimony in. When he denied the admission, and also asserted that this transaction was a secret one, "put over him" behind his back by Shannon, who wished to do an ill turn to Heidmann & Co., and by defendant's faithless clerks, he told a plausible story. The jury might well believe that as to this single instance of misbranding he knew nothing. It was then quite legitimate to show that, so far from this misbranding being a single incident, it was one of many being carried out by his clerks, who had no pecuniary interest at all in such misdoings, for the evidence showed that all of them were paid salaries, with no commission. These circumstances were such as a jury might fairly consider when deciding, as they must, whether or not they would believe his statements that he knew nothing at all about repeated misbranding by his firm, being himself in charge of the coffee side of its business. Since the court most carefully guarded the interests of defendant against any possible misconception by the jury touching the effect of such evidence, we find no error in its admission under the authorities. Williamson v. U. S., 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278 (citing Holmes v. Goldsmith, 147 U. S. 150, 13 Sup. Ct. 288, 37 L. Ed. 118); Wood v. U. S., 16 Pet. 342, 10 L. Ed. 987; Farmer v. U. S., 223 Fed. 903, 139 C. C. A. 341; Stern v. U. S., 223 Fed. 762, 139 C. C. A. 292.

[2] It was argued here that these eight warehouse orders, although it was shown that they came from defendant's office, properly signed, really showed nothing. Counsel for the government suggests that no such objection was made below, as the record seems to indicate. But, however that may be, we see no force in the objection. The coffee in the indictment instance was in two lots marked "H. L. B. C." and "D. B. C." A witness testified that the "C.," of "H. L. B. C.," meant "Caracas" and that "D. B. C." was a trade-mark of Bliss, Dallett & Co. It also was proved that Caracas coffee always comes by Venezuelan Line steamers, of which the Progresso is one, while Bogota coffee comes by the Columbian Line, of which the steamship Allemania is one. Defendant further testified that "M. A. R. A." is a Mexican mark; that "Antenas Choice" is a designation of where the coffee is grown, and that "Escobal Extra Selected" is a shipping mark put on Columbia coffee. Bogota coffee is Columbia coffee. In the light of this testimony the eight shipping orders become quite intelligible.

Exhibit 18, dated April 1, 1914, refers to two lots of coffee; one of 15, the other of 13 bags. The same marks, "H. L. B. C." and "D. B. C.," are given; also the mark "M. A. R. A." Certainly some of this coffee, the "H. L. B. C.," came from Caracas, while the Bliss Dallett coffee ("D. B. C.") apparently was Mexican. The directions given by Mitchell Bros. to the warehouse as to these coffees was to "mix, put into 25 Bogota bags and mark 'P. A. L. Bogota.' " Exhibit 19, dated March 25, 1915, refers to 38 bags of coffee (in lots of 20, 4, 3, 5 and 6 bags). The same marks as on Exhibit 18 appear (with others); certainly some of this was Caracas, some Mexican. The directions given were to put in "Bogota bags and mark 'J. S. Especial.' " Exhibit 20, dated March 25, 1914, refers to two lots, of 5 and 6 bags, respectively. The same marks appear as on No. 18, indicating that one lot was Caracas and the other, apparently, Mexican. The directions given were: "Mix and put into 10 Bogota bags and mark 'Antenas (Antoise) Choice Extra.' " The same remarks apply to Exhibits 21, 24, and 25. In Exhibit 22 the only mark given is "D. B. & C.," but as the coffee is described as "Ex Progresso" it is evidently Caracas. Defendant testified that the coffee referred to in Exhibit 23 was all Caracas coffee which was ordered mixed and put into Bogota bags.

We find no error in the admission of this testimony.

There was sufficient evidence to send the case to the jury, and they were fully and correctly instructed as to presumption of innocence and reasonable doubt.

[3] The court charged the jury that if they should find:

"That defendant Shannon entered into a conspiracy with Hole and others, although not with Mitchell, to commit the offense charged in this indictment, you could convict Shannon although Mitchell should go scot-free. On the other hand, should you find that Mitchell entered into a conspiracy with others than Shannon to carry out and perpetrate this offense against the United States, then you could convict Mitchell, although acquitting Shannon."

Counsel for Shannon excepted on the ground that, if the jury should find that Shannon conspired with Hole or the other witnesses who testified before the grand jury, Shannon could not be convicted. The theory being that the fact that these witnesses testified before the grand jury shows that they were not unknown to the grand jury. Counsel for Mitchell joined in this exception.

It might be sufficient to say that this part of the charge is not assigned as error; but it is also without merit. The mere circumstance that Hole and Von Thaden testified before the grand jury as to what they had done in misbranding the 84 bags of coffee did not establish the proposition that they were known to the grand jury to be conspirators when the indictment was found.

[4] No other error is assigned, but defendant's counsel argues that the method of trial permitted was prejudicial to the rights of defendant. The proposition is that when the government has proof tending to show that defendants have committed a substantive offense, violating some provision of statute, it is not fair to indict and try them for conspiracy to commit that offense. This argument is one to be

addressed to Congress, not to the courts. Congress has made the conspiracy itself a distinct offense, with a penalty differing from, and frequently more severe, than that imposed for the commission of the act which defendants conspired to commit. It would not be difficult to conceive some very good reasons for such an enactment, but any such inquiry would be impertinent; the matter is one wholly within the discretion of Congress.

The judgment is affirmed.