## UNITED STATES v. HEITLER et al.

(District Court, N. D. Illinois, E. D. May 6, 1921.)

No. 7465.

1. **Indictment and information ⟨Key⟩184—No variance because evidence shows persons alleged to be unknown were known to grand jury.**

In a prosecution for conspiracy to violate the National Prohibition Act by shipping a carload of whisky and distributing it among bootleggers or dealers, where the indictment named 31 conspirators, and there were various other persons who may or may not have been parties to the conspiracy, there was no fatal variance, because the indictment charged the defendants named with conspiring with divers other persons to the grand jurors unknown, while offered evidence would have shown that some of the other persons were known to the grand jurors, where the indictment alleged the means and overt acts with sufficient particularity to inform defendants of the nature and cause of the accusation, as required by Const. Amend. 6.

2. **Conspiracy ⟨Key⟩47—Participation in offense intended to be committed does not make defendant guilty of conspiracy.**

To establish a conspiracy to violate a certain criminal statute, the evidence must convince the jury that defendants did something more than participate in the substantive offense which was the object of the conspiracy.

3. **Indictment and information ⟨Key⟩124(2)—All conspirators need not be joined in single indictment.**

There is no requirement in the law that all conspirators be joined in a single indictment, and only such as may well be tried in one case should be named in one indictment.

4. **Criminal law ⟨Key⟩683(1), 684—Evidence held properly admitted, both as rebuttal and as within the court's discretion to admit.**

On a trial for conspiracy to violate the National Prohibition Act, by shipping a carload of whisky under a false permit and distributing it to bootleggers and dealers, where defendants denied returning money to purchasers whose whisky was taken from them by "highwaymen," as testified by witnesses for the government, and denied that M. was employed to sell any part of the carload of whisky, evidence in rebuttal that certain sums of money were sent to a witness in an envelope after a conversation with two of the defendants, and testimony of M. that he was so employed, was properly admitted, both because it was proper rebuttal and because it was

⟨Key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

274 F.—26

within the court's discretion to admit it, even though properly a part of the government's evidence in chief.

5. **Criminal law ⬅️599—Defendants held not surprised, and not entitled to continuance of one day at close of government's case.**

On a trial for conspiracy to violate the National Prohibition Act, defendants *held* not surprised by the government's testimony, and hence the denial of a continuance for one day at the close of the government's testimony was not error, especially where the court did take a short recess, and the defendants produced a witness who left the impression that further delay was unjustifiable.

6. **Criminal law ⬅️510—Uncorroborated testimony of accomplice may be sufficient.**

A conviction may rest on the uncorroborated testimony of an accomplice.

7. **Criminal law ⬅️762(3)—Expression of opinion as to sufficiency of accomplice testimony should depend on testimony.**

If a requested instruction advising the jury that a conviction should not rest upon the unsupported testimony of accomplices was intended merely as an expression of the court's opinion of the weight to be given such testimony, it was within the trial court's judgment whether such expression of opinion should be given or not, and in expressing such opinion he should be guided by the testimony in the particular case rather than by any general rule.

8. **Criminal law ⬅️720(1)—Argument that alibi was "faked alibi" not improper; "fake."**

Where it was the contention of the government that witnesses testifying to an alibi were either mistaken or testified falsely, it was not improper for counsel for the government in his argument to refer to the alibi as a faked alibi, since "fake" means to make or construct, and a "faked alibi" is a made, manufactured, or false alibi.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Fake.]

9. **Criminal law ⬅️723(5)—Not court's province to determine appropriateness of counsel's characterization of defendant.**

It was not for the court to determine the wisdom or appropriateness of counsel's characterization of defendant as a "Shylock," but merely to determine whether there was any evidence to justify the argument, especially where the court told the jury to disregard the entire statement, on defendant's counsel insisting that the statement reflected on defendant's race and religion.

10. **Criminal law ⬅️919(3)—Argument not ground for new trial, when in part supported by evidence and in part characterized by court as improper.**

Argument of counsel for the government that defendant was meek and humble on the stand, and was not the same man that threatened F. with death in a certain station, or the same "king of the underworld," who with a snap of his fingers held the lives of men in his grasp, did not require a new trial, where there was testimony that defendant did threaten F. with death in such station, and the court charged that the statement that defendant was king of the underworld and held the lives of people in the snap of his fingers was improper.

11. **Criminal law ⬅️919(3)—Argument held not ground for new trial, where court charged jury not to consider anything outside the record.**

The argument of counsel for the government, if made as claimed, that defendant could swim in the tears he had caused, if gathered in one reservoir, did not require a new trial, where the court, who did not hear such argument, referred to the claim that it was made, and admonished the jury that anything outside the record was not proper.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Michael Heitler and others were convicted of conspiracy to commit an offense, and they move for a new trial. Motion denied.

James R. Glass and John J. Kelly, both of Chicago, Ill., for the United States.

Weymouth Kirkland, of Chicago, Ill., for defendant.

### Motion for a New Trial.

EVAN A. EVANS, Acting District Judge. Several grounds are presented as the basis for a new trial. Earnestly argued and supported by a brief evidencing study and thought, the disposition of the motion calls for an expression of the court's reasons for overruling it.

### Variance Between Pleading and Proof.

The indictment charges the defendants therein named with having conspired "with divers other persons to said grand jurors unknown," etc. Certain offered, but rejected, evidence would, it is claimed, have shown that the names of such persons were known to the grand jurors. This, it is claimed, was a fatal variance, and numerous cases are cited to support this position. United States v. Riley (C. C.) 74 Fed. 210; Naftzger v. United States, 200 Fed. 501, 118 C. C. A. 598; Cooke v. People, 231 Ill. 9, 82 N. E. 863; State v. Smith, 89 N. J. Law, 52, 97 Atl. 780; Mitchell v. United States, 229 Fed. 357, 143 C. C. A. 477. In opposition, the following may be cited: Jones v. United States, 179 Fed. 584, 593, 103 C. C. A. 142; People v. Smith, 239 Ill. 91, 108, 87 N. E. 885; People v. Mather, 4 Wend. (N. Y.) 229, 21 Am. Dec. 122, 152.

The two decisions, Jones v. United States, 179 Fed. 584, 103 C. C. A. 142, and People v. Smith, 239 Ill. 91, 87 N. E. 885, respectively, admittedly support the court's ruling, while the decision of Judge Taft in United States v. Riley (C. C.) 74 Fed. 210, cited and chiefly relied upon by defendants, may at least be distinguished by the fact that it was not a case involving a conspiracy prosecution. Ruling Case Law, while citing but one case, announces this rule of law to be as the court applied it. 14 R. C. L. 182, 183.

[1] But, ignoring the cases and such distinction for the moment, I am not impressed with the reasonableness of a rule that, without qualification, recognizes a fatal variance between an indictment which alleges on the part of the grand jury an absence of knowledge of the names of others participating in a conspiracy and proof that certain of such other persons were known to the grand jurors and may have been, in some manner, connected with the conspiracy. Better reasoning, it seems to me, requires me to go back to the constitutional provision to ascertain the requirements of an indictment, and to test the sufficiency of the charge by the essentials therein provided; in other words, determine whether the defendants are informed with such certainty as to the nature and cause of the accusation against them as to permit each, assuming his innocence, to properly prepare for trial. If the accused is so informed, the indictment is sufficient; if not, it fails, not because of variance, but because of the requirements of the Constitution, the Sixth Amendment of which reads:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The rule was laid down in Cochran v. United States, 157 U. S. 286, 15 Sup. Ct. 628, 39 L. Ed. 704, as follows:

"The true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

It would require no stretch of the imagination to conceive of a charge which, assuming that a defendant is innocent, would be insufficient in view of the therein contained false or inaccurate allegations that another party not indicted is to the grand jury unknown. Likewise it would be equally easy to imagine a case where the name or names of "divers other persons" would not be helpful to the defendants. Testing the indictment by these tests, we find nothing suggestive of deception. There is nothing which would mislead any defendant. Some 31 are named as conspirators. The means are set out with sufficient particularity, and the various overt acts give dates, places, and names with so much particularity that no defendant could possibly claim that he was taken by surprise by any of the testimony offered by the government.

From this indictment it appears that a carload of whisky, containing 1,000 cases, was, pursuant to the conspiracy to which the 31 defendants and others were parties, purchased from the Old Grandad Distillery Company of Louisville, Ky., and by means of a false and forged permit shipped to Chicago, to be there distributed among the smaller bootleggers or dealers, who, in turn, acted as the spokesmen or representatives of still smaller bootleggers. The serial numbers on the various cases of whisky appear, the route which the car took is given, and the date of the arrival of the car in Chicago. The date of the reconsignment of the car at Peoria, Ill., also appears. The false permit which the shipper used to secure the shipment of the whisky was a matter of record. The books and records of the distillery company were accessible to the defendants. In fact, it seems to the court that the allegations were sufficient to apprise each defendant, innocent or guilty, of sufficient information to permit him to meet every issue.

True, the names of Joy, Miller, Fitz Patrick, Frank, and others do not appear as coconspirators. Neither is it charged that those young chauffeurs, who drove the trucks containing the whisky from the cars to the place of destination, were coconspirators. Many others, who at this time might be mentioned, were not named as conspirators; for instance, the railroad detectives, the police officers, present in abundance at the car, certain railroad employees, to say nothing of many others who contributed their cash to make up the $135,000 alleged to be paid to Heitler, Perlman, and Greenberg. Per-

haps some of them were the "divers other persons to the grand jury unknown."

But, conceding for the moment that these parties were coconspirators and that their names were known to the grand jury, was it necessary, in view of what had been set forth in the indictment, to name them as coconspirators, in order that defendants might fully understand the charges which they were to meet. I think not.

But did the grand jury know the names of other conspirators? It may be true that they knew the names of Joy, Miller, Fitz Patrick, and Mickey Frank; but were they in a conspiracy? Or did they merely violate the National Prohibition Act? Vastly different are the two offenses. This was clearly illustrated on the trial. Numerous defendants were dismissed, not because the evidence failed to establish a criminal case against them, but because it failed to establish the offense of conspiracy against them. The jury likewise acquitted six defendants, not necessarily because they were not guilty of some crime, but because they were not in the conspiracy charged in the indictment. In view of the hours which counsel devoted to the argument on this very distinction, it is hardly necessary to review the evidence.

[2] Must this court, then, become a reviewing court to determine what the evidence before the grand jury established? And this brings me to a consideration of the difference between a conspiracy charge and a criminal offense, such as was considered in the opinion in the Scott Case. To establish a conspiracy to violate a certain criminal statute, the evidence must convince a jury that defendants did something other than participate in the substantive offense which is the object of the conspiracy. To illustrate, A., B., and C. may each have purchased this whisky from D., E., and F. and may have carried it from the freight car in which it arrived, yet not have been in the conspiracy to which D., E., and F. were parties. How can the grand jury's conclusion, necessarily based in part upon their personal observation of witnesses, be reviewed? Can their finding be impeached? If so, can it be impeached by the fact that one or two of the many witnesses who testified before the grand jury also testified upon this trial, and gave counsel or the court an impression which may not have been obtained by the grand jury? I think clearly such review would be unwarranted; not only unjustifiable in law, but impossible in fact.

Take, for instance, the witness Joy, whom the defense now claims to have been in the conspiracy (though at the same time denying that their clients, whom Joy's testimony involves, are in the conspiracy). He was the subject of a long, well-prepared, and skillfully directed cross-examination. Under the attack, he was restive, defiant, and bellicose. May not the impression of his testimony and appearance before the grand jury have been entirely different, though his story was substantially the same? That he violated the National Prohibition Act (41 Stat. 305) may be conceded. That his testimony before the grand jury was the same as upon this trial may also be admitted; but it by no means follows that the grand jury believed he was in the con-

spiracy charged in the indictment. And what has been said of Joy applies, of course, with even greater effectiveness to the many others.

[3] While this might well dispose of the matter, still another reason is suggested for adhering to the view which the court took on the trial. This reason applies with force where the number of conspirators runs into the hundreds. There is no requirement in law that all conspirators be joined in any single indictment. Such as may well be tried in one case should only be named as defendants in any one indictment. The present trial convinced the court that 30 defendants is a large number to try at one time.

But the testimony indicated that a jury might (though not necessarily) have found that the number implicated in this conspiracy was several hundred. Having concluded to limit the number to 31, was the grand jury required to investigate and ascertain who the others were and to name them? Must all the facts as to those not in the indictment be investigated, to judicially determine whether each was or was not in the conspiracy, notwithstanding they are to be named in another indictment? Must the grand jury, upon a partial investigation, name some of them as co-conspirators, though not as defendants? Fairness to such "other divers persons" not named as defendants, I think, requires the grand jury to hesitate before naming them in such a manner as to impair their reputation without at the same time affording to each a prompt opportunity to exonerate himself.

While the argument in support of the alleged variance was based upon the offered testimony of Joy and of grand jurors, who, it is claimed, would testify that Joy appeared and gave testimony before them, it seems to me that failure to name others than Joy would be as fatal as failure to name Joy. But counsel has directed his argument to the failure of the grand jury to name Joy as one of the "divers other persons," and it is apparent as to him that defendants were fully advised concerning his story even before the government began its investigation. When the police officers were making their so-called investigation, and were examining various witnesses—in fact, any and all witnesses, excepting Heitler and Perlman and various policemen, charged with participation in this crime—the defendants learned, if they did not already know, that they were charged by Joy, Miller, Frank, and others with having conceived this conspiracy and carried it out substantially as these witnesses stated upon the witness stand. If the purpose of an indictment be to apprise the defendants of the nature and character of the charge, so that each defendant, be he innocent or guilty, may prepare adequately for trial, then the failure of the grand jury to name Joy or any other person was not fatal in this case.

[4] *Did the court err in permitting witnesses to testify on rebuttal and in refusing to grant a day's continuance after the government's testimony closed?* Both because it was rebuttal and because it was within the court's discretion to admit it, though properly a part of the government's evidence in chief, I think no error was committed in receiving testimony offered by the government on rebuttal. The govern-

ment took nearly three weeks in which to introduce its evidence. The defendants made no opening statement of their case. at the beginning of the trial, and neither the court nor the prosecution knew what position the defense would take until the government rested. Certain government witnesses testified that the defendants Heitler, Greenberg, and Perlman agreed to and did return a part of the money received from purchasers whose whisky was taken from their trucks in Chicago by certain "highwaymen" on the night the car was unloaded. That three truck loads were held up in the streets in Chicago; that the highwaymen, who the witnesses said were policemen, took two trucks and their loads of whisky—is not disputed. Witnesses, who stated they paid Heitler, Perlman, and Greenberg some $31,000 for this whisky, testified for the government, and said they demanded the return of this money, as they had been guaranteed police and federal government protection, which was explained to mean protection against holdups "other than regular holdups." They further stated that money had been returned to them, or to others who gave them money, for this whisky. The defendants denied returning any money to any one. One witness, on rebuttal, testified that certain sums of money were sent to him in an envelope after a conversation with Heitler and Perlman.

Defendants likewise denied all knowledge of the shipment and of participation in the conspiracy, specifically denying that one Moore was employed by them to sell any part of the carload of whisky. Moore was called on rebuttal to dispute this testimony. Other testimony need not be detailed. Certainly, under the circumstances, a fair exercise of the court's discretion demanded that the ultimate facts, which the parties for weeks had sought to prove or disprove, be illuminated by this persuasive testimony.

[5] As to the request for a continuance for a day, I cannot, in view of the situation disclosed at the trial, doubt the propriety of the ruling. Three witnesses only are claimed as surprise. The first was Moore. The evidence showed defendant Perlman met and talked with Moore, who was avoiding the government. Perlman said he talked with Moore about his testimony before the government saw him. Moore testified to certain conversations with Perlman, and they were denied by Perlman. The defense knew Moore would be called, if he could be located by the government. This was known several days before Moore testified.

Another witness, a garage keeper, was brought into the court, and several defendants asked if they had seen him on the night the whisky was unloaded. This occurred several days before the defendants closed their case. On cross-examination, the defense showed they knew more of this man's history than he knew himself. With many closely typewritten pages before him, counsel for the defense cross-examined him searchingly and particularly in reference to this night's occurrences, showing not only no surprise, but skill and industry on the part of defendants' investigators in preparing for his cross-examination.

The other witness testified as to a conversation with Heitler and Perlman respecting the payment of money and his refusal to accept

checks. The conversation was on a street corner outside a poolroom. No one was present but this witness and the two defendants, Heitler and Perlman. The latter two denied the conversation in toto. The defense here, too, was apprised of the witness' coming appearance several days before he was put on the stand. Notwithstanding this situation, the court did take a short recess, and the defense produced a witness, who left the impression that further delay was unjustifiable.

*Did the court err in refusing to give the proposed instruction?* The court was favored with some 20 proposed instructions, submitted by various defendants, covering the subject of testimony of accomplices. In fact, the proposed instructions submitted by all of the counsel must have covered 100 pages. Under these circumstances, as well as for other reasons, it became necessary for the court to make its own analysis of the case and submit its views of the law in its own language. Of course, the proposed instructions were helpful; but it was not consistent with my idea of a proper analysis and a concise presentation of the issues to incorporate all of the proposed instructions, even though many of them, standing alone, were unobjectionable.

Complaint is now made, however, because the court refused to give a proposed instruction advising the jury that it should not convict the defendants upon the uncorroborated testimony of accomplices. The instruction as given reads as follows:

"Certain of the government's witnesses have been called accomplices. They are witnesses who admit that they are parties to the crime charged in the indictment. Their testimony should be scrutinized closely, to ascertain whether they are influenced by any hope of immunity or by any other unworthy motive. Admitting their own guilt, their testimony is not entitled to the same weight as the testimony of an innocent party. * * * But the fact that certain witnesses who have testified may be accomplices * * * will not justify you in rejecting their testimony on that ground alone. The government in criminal cases must sometimes offer the testimony of those who were parties to the crime. Innocent individuals may know nothing of the details of the crime, and only the guilty parties can enlighten you about the criminal transaction. * * * The jury should therefore approach his [the accomplice's] testimony with some caution. They are required to scrutinize it closely, not rejecting it, but scrutinize it carefully, and only cautiously accept it. * * *"

[6] The vice of the charge lies in the fact, so it is claimed, that the court did not advise the jury that conviction should not rest upon the unsupported testimony of accomplices. To have given this charge would, I think, have been error. Since the decision in Caminetti v. United States, 242 U. S. 470, 37 Sup. Ct. 192, 61 L. Ed. 442, Ann. Cas. 1917B, 1168, courts have generally recognized the rule therein announced that conviction may rest upon the uncorroborated testimony of an accomplice. A few of such cases are herewith collected. Graboyes v. United States, 250 Fed. 793, 163 C. C. A. 125; Kelly v. United States, 258 Fed. 392, 406, 169 C. C. A. 408; Reeder v. United States (C. C. A.) 262 Fed. 36, 42; Ray v. United States (C. C. A.) 265 Fed. 257; Freed v. United States, 266 Fed. 1012, 49 App. D. C. 392; Harrington v. United States (C. C. A.) 267 Fed. 97; Block v. United States (C. C. A.) 267 Fed. 524.

[7] Counsel for defendants contend, however, that the proposed

instruction only goes to the extent of advice from the court. In other words, the proposed instruction did not require the jury to acquit unless the testimony of accomplices was corroborated, but did express the court's views on such testimony. If such proposed instruction was merely intended as an expression of the court's opinion of the weight to be given to testimony of accomplices, it was clearly a matter of judgment on the part of the trial judge whether such expression of opinion should be given or not. Certainly I have no hesitancy in declining to accept any hard and fast rule governing the weight of testimony of certain witnesses. If the trial judge is to express his opinion upon the evidence (and I certainly think he should exercise that privilege whenever he thinks it necessary), he should be guided by the testimony in the instant case rather than by any rule that may be generally applicable. In other words, the testimony of accomplices may be weak. Courts may hesitate about accepting it. But in certain cases the court may be thoroughly convinced that it is the truth. Should he, therefore, notwithstanding his general opinion of this class of testimony, ignore the conclusions reached in the individual case, and advise the jury in a manner contrary to what his judgment tells him is the fact? I have no hesitancy in answering this query in the negative.

Criticism is also made because the court refused to charge the jury as requested by defendants concerning the character and nature of the conspiracy charged in the indictment. In this charge the court was guided by the fact that each and every one of the attorneys, both in argument to the court, and in argument before the jury, stated that there was no question of the existence of the conspiracy, and that the only issue between the government and the defendants was over the identity of the parties to the conspiracy. In other words, while each denied that his client was in the conspiracy, the existence of the conspiracy as charged was conceded. It was with this concession as a background that the court charged the jury as it did in respect to the conspiracy.

### Remarks of Counsel.

Numerous statements in the prosecutor's opening argument to the jury, which was decidedly brief, were challenged. At the time the court was under the impression that an experienced counsel was endeavoring to embarrass the speaker, who was inexperienced in presenting a case to the jury. Scarcely a thought was presented without interruptions and challenges. The court unfortunately was occupied in preparing its charge, and perhaps did not hear all of the argument. Only a few of the criticisms will be considered.

[6] It is claimed that government counsel referred to the defendants' alibi as a "faked alibi"; criticism being directed to the word "faked." Webster's International Dictionary defines the word "fake" as "to make; to construct." As used by counsel, it was, I think, understood to mean a made, a manufactured, or false alibi. To characterize it as a false or "faked" alibi was certainly justifiable from the government's point of view, for it was the contention of the govern-

ment that the witnesses, who testified to the facts that established the alibi, were either mistaken or they testified falsely.

[9] Counsel is also charged with having said, speaking of Heitler:

"How much like Shylock he looked. He demanded his pound of flesh and he bled his victims."

Also:                                                                            o

"Mike was playing a part when he sat in this witness chair. He is a great actor. He wanted to impress you how meek and humble he is."

It is claimed this statement and the argument made in support of it was an appeal to prejudice based upon the nationality of Heitler, who counsel stated was a Jew. The court observed that, so far as the comment was directed to the appearance or manner or conduct of Heitler, as shown by the testimony, it was proper; adding, however:

"I wish to say, however, that if any one of you thinks it has any reference to religion in this case, you cannot decide on race or religion. Race or religion has no bearing in this case any more than sympathy or prejudice. As to whether the defendant Heitler impressed you as playing a part or not, that is for you to say, and is a proper statement for counsel to argue."

The attorney also promptly added:

"I wish also to state that there was no idea on my part to bring in anybody's race or religion."

It may be true that the Shylock that Shakespeare immortalized was a Jew, but the character pictured by the master's pen in the Merchant of Venice has been found in all ages, among all races, and in all businesses. Unfortunately, no race has a monopoly of him—no age that does not produce too many of him. Thus it is, when one is selfish, covetous, grasping, when he drives a hard and onesided bargain, he is not infrequently referred to as a Shylock. It was not for the court to determine the wisdom of the reference, or the appropriateness of the characterization. The court was merely to determine whether there was any evidence to justify the argument.

In the present case, witnesses testified that Heitler, Perlman, and Greenberg bought a carload of whisky for $32,000, and sold it to bootleggers for $135,000, requiring the purchasers to pay cash in advance; that they gave no receipts for moneys advanced, and did not bind themselves to deliver any particular grade of whisky, and this all in violation of the law of the land. Nevertheless, when defendant's counsel subsequently insisted that this statement was a reflection upon the defendant Heitler's race and religion, the court specifically charged the jury to disregard the entire statement.

[10] Further objection was made to the statement purporting to be as follows:

"Mike walks to the chair, and you would think that Mike was going to the electric chair; he was so solemn. In answer to the questions of his counsel, he is meek and humble. Why, it is not the same man that threatened Morris Frank with death in the Englewood station. It is not the same king of the underworld who, with a snap of his fingers holds the lives of men in his grasp. No; but he cried."

Objection was made because of its appeal of prejudice, and because the statement was unsupported by the record. There was testimony that Heitler threatened Frank with death, and that it occurred in the Englewood station. There was testimony in the record that Heitler had been convicted and sent to the penitentiary for violation of the so-called Mann Act, or White Slave Law (Comp. St. §§ 8812–8819). There was testimony that he had run various places, and that some at least had been closed up because of their bad repute. The court, nevertheless, ruled in reference to the allegation that Heitler was "king of the underworld":

"I recall no testimony that supports such argument."

And he further stated:

"The statement that he was king of the underworld and that he holds the lives of people in the snap of his fingers is improper."

[11] Counsel is also charged with having said, when referring to Heitler weeping upon the witness stand:

"If all the tears that Mike caused were gathered in one reservoir, Mike Heitler could swim in it, asking for mercy."

Whether such statement was made or not, the court cannot say. At any rate, the court did not so understand it at the time. Later, defendant's counsel having referred to it, the court specifically and in its last charge to the jury instructed them as follows:

"During the argument of the attorneys, some reference was made to tears having been shed. I do not believe I understood counsel making the statement at the time. I am not sure, but I want to now, at this time, admonish you that anything outside of this record, outside what was received on this trial, is not proper."

Of course, the foregoing excerpts from the argument of assistant prosecutor do not fairly represent the entire argument. Viewed as an entirety, no impression could possibly have been given the jury that would have influenced it to decide the case other than on the facts. So satisfied were the defendants with the impression which the government prosecutor left that, I am advised, they seriously considered the advisability of waiving any and all argument.

It follows that the motion for a new trial must be and is hereby denied. The court will impose the sentences on Wednesday, May 11th, at 9:30 a. m. The clerk will notify all counsel.

---

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes